F. Ray MARSHALL, Secretary of Labor of the United States, Plaintiff,

v.

George SNYDER et al., Defendants.

No. 77 C 116.

United States District Court, E. D. New York.

April 28, 1977.

---

U. S. Dept. of Labor by Monica Gallagher, Mary S. Calfee and Sherwin Kaplan, Washington, D. C., for plaintiff.

Murphy & Maviglia, New York City, for defendants George Snyder and Irving Rosenzweig.

Herbert A. Simon, Valley Stream, N. Y., for defendants 806 Record Processors, and General Teamsters Industrial Emp. Local 806.

Shea, Gould, Clemenko & Casey, New York City, for defendants Albano, Arth, Calagna, Clarke, Conviser, Grippo, Isola, Kant, Lipshitz, Petcove and William Snyder.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge.

Invoking the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, the Security of Labor has brought this action to obtain equitable relief to redress alleged violations of Title I of ERISA. Subject matter jurisdiction exists under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

The complaint designates as defendants: General Teamsters Industrial Employees Local 806 (Local 806 or the Union); several present and former trustees of the Union's Health and Welfare Fund (the Welfare Plan), Pension and Retirement Fund (the Pension Plan), and Annuity Fund (the Annuity Plan); and 806 Record Processors, Inc. (RPI). Alleged to be a wholly owned subsidiary of the Welfare Plan, RPI performs the administrative functions of all the Plans. Some of the defendant trustees are members of the Union's Executive Board; some are officers, directors, or employees of RPI; and some are both.

In the main action, the Secretary seeks to redress past dissipation of the assets of the Plans and to prevent similar dissipation of their assets in the future. On January 25, 1977, the Secretary moved for a preliminary injunction and appointment of a receiver. Prior to the return date, the parties agreed to and submitted to the court an order for a consent disposition of the motion. On February 4, 1977 the then acting "Miscellaneous Judge" signed the consent order which provides in part:

1) that defendant trustees of the Local 806 Welfare Fund, Pension Fund, and Annuity Fund shall not make or permit to be made any direct or indirect payments for any purpose from the assets of the respective Funds of which they are trustees to defendant George Snyder, to any of the other individual defendants, to defendant Local 806, or for the benefit of any of said defendants;

2) that defendant 806 Record Processors, Inc. shall not hereafter make or permit to be made any direct or indirect payments for any purpose from its assets to defendant George Snyder, to any of the other individual defendants, to defendant Local 806, or for the benefit of any of said defendants; with the only exception that 806 Record Processors, Inc. may continue to make salary payments for services actually rendered to defendants Clarence Clarke, Anthony Calagna, James Isola, and William Snyder in amounts not exceeding the following:

| | Maximum per Week |
|---|---|
| Anthony Calagna | $ 750 |
| Clarence Clarke | $ 300 |
| James Isola | $ 825 |
| William Snyder | $ 600 |

3) that defendant trustees of the Welfare Fund, Pension Fund, and Annuity Fund shall make all books and records of the respective Funds and of 806 Record Processors, Inc. available for inspection and copying to the attorneys for the plaintiff or their agents, during normal business hours upon one (1) day's prior notice.

The Secretary now claims that the consent order has been violated and, asserting that the assets of the Plans are still being dissipated to the detriment of the participants and beneficiaries of the Plans, he has moved for an order (1) appointing an interim receiver to manage and control all income, assets, and disbursements of the Plans and RPI; (2) holding the defendants in contempt of the consent order of February 4, 1977; (3) enjoining RPI and the trustees of the Plans from making payments to defendants Calagna, Clarke, Isola, and William Snyder; (4) directing defendants to comply with subsequent discovery demands made by the Secretary in accordance with the Federal Rules of Civil Procedure; (5) awarding the Secretary reasonable fees and costs; and (6) granting him "such further relief as may be equitable and just".

The Secretary bases his instant claims for relief on two principal contentions. First, he asserts that defendants are permitting payments to be made to Isola, Calagna, Clarke, William Snyder and other unspecified defendants in violation of the consent order. More specifically, the Secretary contends that the Plans through RPI are making payments to those defendants either for no work at all, or for work performed for the Union, and not the Plans or RPI. Second, he asserts that defendants have frustrated his attempts to supervise their performance or non-performance of the consent order by failing to comply with his discovery requests.

With respect to the motion, defendants claim that the payments in question were for the benefit of the Plans and necessary to their operation; that even if a portion of the work done by RPI's employees was for the benefit of the Union, precisely that arrangement was contemplated by the consent order which was designed to preserve the status quo; and that defendants have cooperated with, not prevented discovery.

On April 21, 1977 an evidentiary hearing was held. Testimony was elicited from Stanley Geller, the accountant for the Union, the Plans, and RPI; Annie Craig, the medical claim processor for RPI; Constance Mavroson, the bookkeeper and office manager for the Union, the Plans, and RPI; Mary Calfee, an attorney for the Department of Labor; defendant William Snyder, recording secretary for the Union, a trustee of the Annuity Plan, and an employee of RPI; defendant James Isola, vice president of the Union and an employee of RPI; defendant Anthony Calagna, president of the Union and the president and a director of RPI; John Gonzalez, an employee of RPI; and defendant Clarence Clarke, a trustee of the Pension Plan and an employee of RPI. Twenty-five exhibits were admitted into evidence.

For the purposes of the instant motion, the court has made the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Local 806 is a union which represents approximately 2,160 member-workers organized into approximately 120 separate "shops", involving approximately 102 employers.

2. The Welfare Plan is a plan established by Local 806 for the purpose of providing the Union's members and their beneficiaries medical, unemployment, and other benefits.

3. About 10,000 potential beneficiaries, including 2,040 union members, are covered by the Welfare Plan.

4. The Pension Plan is a plan established by Local 806 to provide retirement income to the Union's members.

5. About 1,032 union members are covered by the Pension Plan. Seventy-four persons are now receiving pensions under the Plan.

6. The Annuity Plan is a plan organized by Local 806 to defer the accrual of income earned by union members.

7. The Plans are funded by employers of the Union's members pursuant to rates of payments set up in the Union's collective bargaining agreements.

8. RPI is a corporation, organized in March of 1975, which performs all the administrative functions of the Plans. For instance, it maintains all their records, it processes all claims made against them, and it collects employer contributions owing to them.

9. Defendants George Snyder and Irving Rosenzweig, as trustees of the Welfare Plan, own all of RPI's outstanding stock.

10. The Union's Executive Board currently consists of the following six persons: defendant Calagna, the Union's president; defendant Isola, the Union's vice president; defendant George Snyder, the Union's secretary-treasurer; defendant William Snyder, the Union's recording secretary; defendant Rosario Albano, a trustee of the Union; defendant George Arth, a trustee of the Union; and John Gonzalez, the third trustee of the Union. Of these individuals, only Arth and Albano are compensated directly by the Union, each at $125 per month.

11. The Welfare Plan has two trustees: George Snyder and Irving Rosenzweig, an officer of an employer under contract with a Local 806 shop.

12. The Pension Plan has two trustees: Clarke and Joseph Grippo, an officer of another "Local 806 employer".

13. The Annuity Plan has four trustees: George Snyder, William Snyder, Irving Rosenzweig, and Benjamin Petcove, who, like Rosenzweig and Grippo, is an officer of a Local 806 employer.

14. RPI's president is Calagna.

15. RPI has three directors: Calagna, Petcove, and Rosenzweig.

16. Calagna, Clarke, Isola, and William Snyder have been employed by RPI as "field representatives" since its organization in March, 1975.

17. Gonzalez is also employed by RPI as a "field representative".

18. As of February 4, 1977, Ronald Kremens was similarly employed by RPI. Sometime thereafter his employment with RPI terminated.

19. Peter DeVuone is a paid employee of RPI. He serves as the chauffeur of George Snyder who is not an employee of RPI.

20. The Union, the Plans, and RPI share offices located at 275 Broad Hollow Road, Melville, New York. The various entities do not occupy separate space within these offices.

21. From the time the Union, the Plans, and RPI first occupied their present offices around January of 1976 until shortly after this action was filed in January of 1977, RPI had paid the entire rent for the jointly used offices.

22. The document marked as defendants' Exhibit B purports to allocate the office space rented by RPI to the various entities using that space. It assigns 43% of the space to RPI, 20% to the Welfare Plan, 20% to the Pension Plan, nothing to the Annuity Plan, and 17% to the Union.

23. Exhibit B assigns to RPI, *inter alia*, three offices which together comprise more than 10% of the leased space. These offices are used by Calagna, Isola, and William Snyder, none of whom performs appreciable in-office duties for RPI. The assignment of the three offices to RPI for purposes of rent allocation is clearly unwarranted and reflects a more general underestimation of Union use of the rented space.

24. The office space allocation document, Exhibit B, was prepared in November or December of 1976 at the earliest.

25. It is more likely than not that an increased fear of civil or criminal sanctions was the reason for the recent move toward

shifting to the Union some portion of the rent for the offices occupied by it, RPI, and the Plans.

26. Overall, Exhibit B represents more of a gesture than a bona fide attempt to allocate the Melville office space among the Union, the Plans, and RPI. Exhibit B substantially underestimates the extent to which the offices are used for union as opposed to plan or RPI purposes.

27. Even though Exhibit B was prepared in November or December, 1976, as of mid-April, 1977, only one or two rental payments had been made by the Union for its "share" of the space, with the burden of the remainder of the rent resting on RPI and the Plans.

28. Geller, who is the accountant for RPI, the Plans, and the Union, and who prepared Exhibit B, testified that eventually the Union's share of the rent for the offices would be paid retroactively.

29. RPI employs at least four clerical employees, all but one (Annie Craig) of whom perform union as well as RPI duties. Nevertheless, they are all compensated by RPI and not by the Union.

30. The Union pays only one clerical employee, Constance Mavroson. She receives $320 per week and is the bookkeeper and office manager for the Union, the Plans, and RPI. Mavroson is not compensated by RPI or the Plans.

31. Aside from Mavroson, Arth, and Albano, only one other person has been on the Union payroll since February 4, 1977, namely James Kant who is retired and has been receiving $400 per month purportedly in back pay.

32. The Union's annual income consists of approximately $350,000 in dues which are deducted from members' wages by employers and paid directly to the Union.

33. The Welfare Plan's annual income consists of approximately $1,000,000 in direct employer contributions.

34. The Pension Plan's annual income consists of approximately $300,000 in employer contributions.

35. The Annuity Plan's annual income consists of approximately $75,000 in employer contributions.

36. RPI's annual income totals approximately $336,000. It receives about $300,000 from the Welfare Plan each year, about $36,000 from the Pension Plan, and nothing from the Annuity Plan.

37. During the first three months of 1977, RPI received $110,000 from the Welfare Plan and $9,000 from the Pension Plan.

38. From February 7, 1977, through April 19, 1977, RPI paid the following amounts to the indicated individuals:

| | Salary | Expenses | Total |
|---|---|---|---|
| Calagna | $ 5,100 | $ 1,500 | $ 6,600 |
| Isola | 9,225 | 1,650 | 10,875 |
| William Snyder | 4,500 | 1,650 | 6,150 |
| Clarke | 2,100 | 1,500 | 3,600 |
| Kremens | 1,493 | 900 | 2,393 |
| Gonzalez | 3,458 | 1,430 | 4,888 |
| DeVuone | 1,727 | 737 | 2,464 |
| Craig | 2,000 | 0 | 2,000 |
| Other clerical personnel | 6,020 | 0 | 6,020 |
| Totals | $35,623 | $ 9,367 | $44,990 |

39. Exhibit 22 provides a more detailed breakdown of the payments summarized above.

40. No salary is paid by the Union to any of the persons listed in finding #38.

41. RPI's "field representatives" do not participate in in-office processing of claims under the Plans or in any other in-office work for RPI of any significance. Clarke signs checks for RPI but does so without reviewing the claims covered by them. His function in this regard entails nothing more than signing his name to checks presented to him by RPI's clerical staff. Any check-signing duties that the other field representatives might perform are no more significant than those performed by Clarke.

42. RPI's "field representatives", including Calagna, Clarke, Isola, William Snyder, and Gonzalez, do provide substantial services for the Union as liaisons to the members and the shops, in organizing new shops, and in renegotiating collective bargaining agreements.

43. Field representatives undoubtedly assist some members of the Union in filling out various plan-related forms; but since

the forms are not complicated, problems in completing them are probably almost always solved without the direct assistance of a field representative.

44. Field representatives sometimes act as liaisons between RPI's clerical staff and union members; however, not only does this liaison function consume a small proportion of the representatives' time, it also is largely unnecessary since the clerical staff is readily available to answer questions and provide assistance to the participants.

45. When they visit the Union's shops, the representatives sometimes answer questions asked by members about the Plans.

46. In the event an employer is substantially, e.g., 60 days, delinquent in its payments to the Plans, field representatives are responsible for seeking collection of these payments; however, substantially delinquent payments are not common. At present, no more than four of the Union's 120 shops are delinquent in their plan payments.

47. Field representatives spend a significant proportion of their time preparing for and engaging in the negotiation of contracts between the Union and various employers. Normally, each shop renegotiates its contract every three years.

48. Since January of 1977, the field representatives have negotiated at least one new contract for the Union and renegotiated at least five old ones.

49. Field representatives are responsible for collecting for the Union delinquent dues payments from employers. Dues are deducted by employers directly from their employees' wages.

50. Field representatives spend a significant proportion of their time organizing new shops for the Union. Organizing a new shop can require the continual efforts of more than one representative over a two-month period.

51. Field representatives are always on call in the event of a dispute or grievance arising at one of the shops.

52. Prior to the organization of RPI, Isola was paid only by the Union and he performed essentially the same functions that he does now as a "field representative" for RPI. No evidence was elicited to show that Isola's experience in this regard differed in any way from that of the other field representatives.

53. On March 23, 1977, RPI, by and through its attorney, refused to produce certain documents and records requested pursuant to FRCP 34, pertaining to said corporation and within its possession and control, notwithstanding the fact that the consent order inter alia expressly provides plaintiff with access to RPI's books and records. RPI's counsel orally stated that such production was being withheld on the ground that the documents pertained to the corporation's internal operations. The asserted ground was frivolous and appears to have been intended to delay and obstruct plaintiff's discovery.

## CONCLUSIONS OF LAW

◼ A. The Welfare, Pension, and Annuity Plans are "employee benefit plans" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3)

◼ B. As to each of the Plans, each of the following is a "party in interest":

The Union. 29 U.S.C. § 1002(14)(D).

RPI, as a person providing services to a plan. 29 U.S.C. § 1002(14)(B).

Calagna, William Snyder, Isola, Clarke, Kremens, Gonzalez, and DeVuone, as employees of RPI. 29 U.S.C. § 1002(14)(B).

Calagna, Isola, William Snyder, and George Snyder, as officers of the Union. 29 U.S.C. § 1002(14)(H).

◼ C. As to the Welfare Plan, George Snyder is both a fiduciary and a party in interest by virtue of being its trustee. 29 U.S.C. § 1002(14)(A).

◼ D. As to the Pension Plan, Clarke is both a fiduciary and a party in interest by virtue of being its trustee. 29 U.S.C. § 1002(14)(A).

■ E. As to the Annuity Plan, George Snyder and William Snyder are both fiduciaries and parties in interest by virtue of being its trustees. 29 U.S.C. § 1002(14)(A).

■ F. The payments by RPI of salaries to Calagna, William Snyder, and Isola, who are officers of the Union, were prohibited transactions within the meaning of 29 U.S.C. § 1106(a)(1)(C).

■ G. The payment by RPI of salary to DeVuone, a substantial part of whose work was as chauffeur for defendant William Snyder, who in turn is a party in interest as an officer of the Union, was a prohibited transaction within the meaning of 29 U.S.C. § 1106(a)(1)(C).

■ H. The payments by RPI of salaries to Gonzalez, Kremens, and defendant Clarke, a substantial part of whose work was for the benefit of the Union, a party in interest, were prohibited transactions within the meaning of 29 U.S.C. § 1106(a)(1)(C).

I. The salaries paid by RPI to defendants Calagna, William Snyder, Isola, and Clarke since February 4, 1977 violated the consent order since a substantial portion of the services performed by them for those salaries were not actually rendered to or for the benefit of RPI or the Plans, but for the benefit of the Union.

J. To the extent that payments were made by RPI after February 4, 1977 to defendants Clarke and Isola for "accumulated vacation pay", those payments violated the terms of the consent order which prohibited RPI from making "any direct or indirect payments for any purpose from its assets * * * to any of the * * * individual defendants" except for certain salaries.

K. The salary payments made by RPI since February 4, 1977 to Messrs. Gonzalez and Kremens, who were performing substantial services for the Union, violated that part of the consent order which prohibited RPI from making "any direct or indirect payments for any purpose from its assets" either to or for the benefit of the Union.

L. Some of the clerical work done by the four clerical employees who were paid by RPI since February 4, 1977 was work done for the benefit of the Union and, therefore, violated the consent order.

■ M. Organizing new shops, negotiating new contracts, renegotiating renewals of contracts, handling grievances of union members, and handling other disputes by union members with employers, while all proper union functions, are not proper or appropriate activities for the Plans or RPI to engage in.

■ N. The best interests of the Plans' participants and beneficiaries require immediate appointment of a receiver for all three Plans and RPI pending final determination of this action.

## DISCUSSION

■ The Employee Retirement Income Security Act of 1974 is a comprehensive remedial statute enacted to protect "the interest of participants in employee benefit plans and their beneficiaries, * * * by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to Federal courts." 29 U.S.C. § 1001(b). Section 1104(a)(1) of title 29 of the United States Code establishes the fundamental standard to which all fiduciaries of employee benefit plans are subject:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

In this action it is claimed that the defendant trustees as fiduciaries acted, in violation of the statute, neither solely in the interest of the participants and beneficiaries nor prudently in causing or permitting the improper expenditure of plan assets, and making payments which are far in excess of any reasonable expense of administering plans of this size and kind.

Clearly the activities of RPI and the Union have been extensively intertwined. Several employee witnesses acknowledged that in their operations no work distinctions were drawn between the Union, the Plans and RPI.

The consent order represented an attempt to bring these operations in compliance with ERISA which was intended to separate the interests of the Union and its officers from those of the Plans, their participants and beneficiaries. So close are the interrelationships in this case, however, that it is apparently impossible to obtain compliance with the purposes and requirements of ERISA as long as the overlapping of duties, salaries, and interests continues.

The inherent conflict of interest and potential for self-dealing which result from the union officers' controlling both the Plans and RPI, which is the administrative agent of the Plans, coupled with the actual conduct of the defendants since the consent order, and when interpreted in the light of the serious charges of misappropriation of trust fund monies alleged in the complaint, require immediate and drastic action by the court in order to preserve from further dissipation the assets of the Plans for the benefit of their participants and beneficiaries.

The Welfare and Pension Plans pay to RPI over $300,000 a year for record keeping and administration. This constitutes nearly 25% of their total annual income, which should be used primarily for the participants and beneficiaries. On the evidence before the court, it appears that the services required for the actual administration of these Plans do not warrant such a large expenditure. The bulk of the expenditures currently being made is (a) for compensation of the field representatives, all of whom perform substantial services for the Union, but receive no compensation from the Union, and (b) for rental of the offices which are used to a substantial extent for the benefit of the Union, and which in any event are far beyond the reasonable requirements for plan administration.

Accordingly, there is need for the immediate appointment of a receiver of the Plans and of RPI, the corporation wholly owned by the Welfare Plan.

The thrust of this action is to counter past and future dissipation of the Plans' assets. As to past dissipation, the Secretary's allegations focus primarily upon: (1) the excessive compensation of defendant George Snyder, $1,239,500 in two and one-half years; (2) the extension of a $290,000 loan by the Welfare Plan to the Union via RPI, a corporation wholly owned by the Plan; and (3) the use of more than $350,000 of Pension Plan assets to refurbish the offices jointly occupied by the Union and the Plans.

The matters which are subject of this motion show a pattern of manipulation and diversion of plan assets similar to that alleged in the complaint, although here lesser amounts are involved. RPI's payments of salaries to field representatives who perform substantial services for the Union, to clerical employees who perform at least some services for the Union, and to De-Vuone who serves as George Snyder's personal chauffeur, all reflect a continuing pattern of diversion of monies to or for the benefit of the Union, and, therefore, not "solely in the interest of the participants and beneficiaries". 29 U.S.C. § 1104(a)(1).

This dissipation of plan assets must stop if the legitimate rights and expectations of the Plans' participants and their beneficiaries are to be protected. One of ERISA's primary objectives is to safeguard the interests of participants and beneficiaries. Even without the strict standards of ERISA, however, the court's primary concern with such trust assets would have to focus upon similarly protecting the participants and beneficiaries.

Whether the actions of the trustees of the respective Plans in permitting the transactions which have been disclosed here are sufficient to warrant their permanent removal pursuant to 29 U.S.C. § 1109, is a question which will be determined after a full trial on the merits of this action. For present purposes, the trustees of each of the three Plans need only be suspended from their functions and activities as trustees pending final determination of the action. Until that final determination, all of the trustees' functions shall be performed by a temporary receiver who shall operate and administer the three Plans and defendant 806 Record Processors, Inc. in accordance with the terms of the plan instruments and the requirements of ERISA, and subject to further order of this court. All defendants are ordered to cooperate with the receiver and provide him with such information, records, and documents as he may require for the performance of his duties.

The court reserves decision on that portion of the motion that seeks to punish the defendants for contempt. The contempt defendants are admonished, however, that the court may consider the extent and effectiveness of their cooperation with the receiver as having some evidentiary weight in determining the defendants' states of mind and intentions in connection with their prior dealings with the Plans and with RPI. One of the questions bearing on contempt is whether the contempt defendants believed in good faith, although perhaps erroneously, that the intent of the consent order was to preserve a "status quo" condition even though that "status quo" constituted transactions prohibited under ERISA and perpetuated on a reduced scale a pattern of diversion of trust monies for the benefit of some of the individual defendants and the Union. Whatever may have been their belief then, the contempt defendants can no longer retain that belief in light of this decision. Their conduct has clearly violated both the consent order and the prohibitions of ERISA. Prompt and willing cooperation with the court and its receiver from this point on could be viewed by the court as evidence of the defendants' good faith up to this point.

▮ The plaintiff's motion is granted to the extent that:

A. All defendants are enjoined *pendente lite* from making or causing or permitting to be made any payments by RPI or any of the Plans to defendants Calagna, Isola, William Snyder, or Clarke; and

B. Edgar G. Brisach, Esq. of 1539 Franklin Avenue, Mineola, New York 11501 is hereby appointed receiver of Local 806 Teamsters Health and Welfare Fund, Local 806 Teamsters Pension and Retirement Fund, Local 806 Teamsters Annuity Fund, and 806 Record Processors, Inc. pending final determination of this action.

Plaintiff shall submit on notice to the defendants and the receiver a more formal order of appointment of the receiver, including therein such provisions as may be appropriate for the special circumstances of this case, as well as provision for compensation of the receiver and any professional assistance he may require. In the meantime, from the date of filing this memorandum and order, the receiver shall have all powers over the assets, liabilities, and management of the three Plans and RPI which a receiver customarily may exercise under the jurisdiction of a United States District Court.

With respect to the discovery requests by the plaintiff, defendants and their counsel are directed to comply with plaintiff's demands with a view to completing all discovery expeditiously and scheduling a prompt trial on the merits.

The receiver shall serve initially without bond, but in the more formal order to be submitted for approval by the court the plaintiff shall include an appropriate recommendation as to whether or not a bond should be required, and if so in what amount.

No formal transfer of title to the assets of the Plans and RPI shall take place until filing of the more formal order referred to above.

Defendants are enjoined until further order of this court from making or permitting any property or other transfers of assets by any of the Plans or RPI to any person, firm, or corporation other than (1) to participants or beneficiaries of the Plans for the purpose of paying benefits due under the Plans, and (2) wages paid with the approval of the receiver.

On all other aspects of plaintiff's motion, including counsel fees and contempt, decision is reserved.

SO ORDERED.