Thomas GILLIAM, Jr., Plaintiff,

v.

Thomas F. EDWARDS and North Jersey Asphalt Workers Local 889 Pension and Welfare Fund, Defendants.

Civ. A. No. 78–1633.

United States District Court,
D. New Jersey.

June 9, 1980.

Isles, Newman & Weissbard by Harvey Weissbard, West Orange, N. J., for plaintiff.

Michael A. Querques by Louis Esposito, Orange, N. J., for defendant Edwards.

Parsonnet, Duggan & Pykon by Albert S. Parsonnet, Newark, N. J., for defendant Pension and Welfare Fund.

## OPINION

CLARKSON S. FISHER, Chief Judge.

Under central scrutiny in this pension fund controversy are the splintered employment responsibilities of defendant Thomas F. Edwards. At crucial times, Edwards wore three job hats, simultaneously serving as paid administrator of defendant North Jersey Asphalt Workers Local 889 Pension and Welfare Fund, trustee of the Fund, and business manager of Local 889, Laborers' International Union of North America, parent union of the Fund. At the nub of this alleged conflict of interest is a December 12, 1974 contract between Edwards and the Fund hiring him as administrator and cementing his triple connection. Plaintiff, Thomas Gilliam, Jr., union member and participant-beneficiary of the Fund, focuses on the contract to allege Edwards' violation of federal statutory (ERISA)[1] and common law fiduciary standards as well as the contract's unconscionability. The defendants answer by denying each claim and affirma-

tively raising the statute of limitations.[2] Characterizing this action as "politically motivated,"[3] defendants spotlight Edwards' administrative competence and compliance with ERISA and state law requirements to support the contract's validity. Bench trial complete, I enter findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Local 889 is a labor union which provides workers for the asphalt industry who are primarily engaged in paving roads. Defendant Fund provides welfare and pension benefits for Local 889 members. The Executive Board of the union local is responsible for properly conducting its affairs in accordance with the constitution. UNIFORM LOCAL UNION CONSTITUTION OF THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, art. IV, § 3(H)(11) (1976). Its seven members include the president, vice-president, recording secretary, and business manager. UNIFORM LOCAL UNION CONSTITUTION, art. IV, § 3(H)(1)–(2). The Fund, originally established in trust by the November 7, 1951 Agreement and Declaration of Trust, is administered by a board of four trustees. The union and the management each selects two trustees as employee and employer representatives respectively.

From 1961 to June 1976, defendant Edwards served both as Local 889's business agent and union trustee. By July 1976, after a contested election for business manager, Edwards was voted out of office; William Blackwell, the victor, also became the new union trustee. For a period, Thomas Parsonnet, counsel to both the Local and the Fund, was Edwards' co-trustee for the union, until his resignation in December 1974. A close relationship developed between them, Edwards respecting Parsonnet

---

1. The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101–1114.

2. Defendants' answer barely alleges "[t]his action is barred by the statute of limitations." Their failure, however, to otherwise discuss this defense—codified in ERISA at 29 U.S.C.

§ 1113—at trial or within their post-trial brief amounts to its abandonment.

3. 1 Trial Transcript at 7–8. Three volumes hold the trial testimony. Roman numerals signal the appropriate transcript.

as "the best union lawyer there was in the state." [4]

Years before he became paid Fund administrator by the December 12, 1974 contract, Edwards actually managed the Fund without compensation. He became Fund manager in 1967 and performed basically the same duties prior and subsequent to his official employment by the Fund. In a typical pre-December 1974 work day, Edwards discharged both union and Fund responsibilities. As business manager, Edwards normally arrived at the union office by 6 to 6:30 a. m. to assign work to the men. He ventured into the field to check work progress or smooth problems between 8 and 9 a. m., returning to the offices between 11 and 11:30 a. m.[5] Edwards then spent a healthy portion of the afternoon regulating the Fund and advising or assisting its participants. His tasks included overseeing and implementing the separate funds, determining eligibility and benefit payments, explaining to participants their rights and benefits, authorizing the investment of Fund monies, checking the records and books, and mediating between participants and doctors or hospitals.

As business agent, Edwards received compensation from the union, making no money by field work in the asphalt industry. Although his net (take-home) weekly salary was $250, his pay actually exceeded that amount since the union paid his taxes. Further, the union, as Edwards' employer, contributed to the Pension and Welfare Fund on his behalf until he was hired as Fund administrator, and provided his all-expenses-paid business use of a union car. For periods in 1974, Edwards received no pay from the union since funds were low, but he fully expected future remuneration. Edwards eventually brought a state court action against the union, claiming $7,200 in back wages and salary, and $15,000 in severance pay. In settling this case, he accepted $15,000, a sum covering his entire back claim and over half of his severance claim. Edwards' reported gross earnings were $15,800 in 1972 and $16,559.46 in 1973.

Crucial are the events culminating in Edwards' December 12, 1974 contract with the Fund. At a July 18, 1974 meeting of the Fund Board of Trustees, Edwards asked the Board to consider paying him as Fund administrator-manager. The trustees unanimously agreed, but postponed further discussion pending "legal clarification" by absent trustee Parsonnet. Apparently, management trustees A. Spencer Marsellis and Robert C. Bossert had discussed the payment possibility with Edwards prior to the July 18th meeting; Marsellis and Bossert even broached the topic between themselves before Edwards spoke to them, noting his work for the Fund merited monetary reward.

At the August 15, 1974 trustees meeting, there ensued a discussion about establishing a permanent administrator, Edwards claiming that he already performed many of those duties without pay. Edwards introduced a resolution passed by an indeterminable percentage of the union membership at an August 14, 1974 meeting, indicating that the requirements of his business manager position left him time to act for the Fund and approving his part-time employment as Fund manager "at such [s]alary as he can arrange for." Parsonnet noted the validity of Edwards' administrative role under present law but mentioned the possible need for reappraisal with the enactment of new pension legislation (ERISA). Edwards was aware of its pendency. A motion that Edwards be employed as administrator at a weekly salary of $200 was then passed. Edwards, who remains to date Fund administrator, has since enjoyed weekly increases to $212, effective April 1, 1977, and to $225, effective April 1, 1978. Edwards' status as paid Fund administrator was no secret among the membership, yet no one objected to his involvement until June 1976. Edwards generally performed his Fund duties competently and comprehensively.

At the November 22, 1974 trustees meeting, Parsonnet again absent, Edwards re-

---

**4.** III Trial Transcript at 29.

**5.** The union and Fund offices occupied different floors of the same building.

quested the Board's approval of a five-year contract for him as Fund manager. To Marsellis' recommendation that Parsonnet design the contract, the Board unanimously agreed. Present at this gathering was Thomas Walker, recording secretary of Local 889.

Parsonnet then sculpted the document, trustees Marsellis and Bossert relying upon him to properly and protectively draft the contract for the Fund. Prior to Parsonnet's finalizing the contract, Edwards discussed—but did not author the actual language of—its provisions with him. Edwards, without an independent attorney in this matter, relied upon Parsonnet to guard both his and the Fund's interests. Securing a self-advantageous agreement was a conscious concern of his.

By contract dated December 12, 1974, the Fund hired Edwards as its administrator for a weekly salary of $200 for five years. As prerequisites to agreement, the Fund recognized Edwards as a "part-time employee" of Local 889 and acknowledged his abilities and knowledge of Fund beneficiaries. The Board largely controlled Edwards' salary adjustments; increases, necessarily justified by cost-of-living escalations, required negotiations with the Board. Edwards' incurred administrative expenses received outright reimbursement. Only Edwards had an option to renew for an additional five years upon 90 days written notice to the Board. Further, he alone retained termination rights, effective upon 90 days written notice to the Board. There is no provision for reciprocal notice by the Board. Marsellis, Bossert, and Walker signed the contract as approving trustees.

Walker executed Edwards' contract as the duly appointed Fund trustee replacement for the departed Parsonnet. By September 25, 1974 resolution, the Executive Board empowered Edwards to name or change trustees. Edwards thereafter appointed Walker, who attended trustee meetings prior to Parsonnet's resignation, effective December 5, 1974 and accepted by the Board of Trustees on December 12, 1974. The minutes of the January 16, 1975 Board

meeting list Walker as a trustee; they further note the Board's acknowledgment of a letter from Local 889 appointing Walker as union trustee. Walker's appointment was common membership knowledge, yet no one disputed it until June 1976.

I

*Threshold Questions of Governing Law: ERISA's Applicability, Effective Date, and Relation to State Law*

█ The complexity of ERISA's design mandates careful exploration of its jurisdictional requirements and interaction with state law. Candidates for ERISA coverage must initially measure up to the Act's basic legal requirements, primarily contained in §§ 1002 & 1132. Next to be examined is the extent of ERISA's infiltration, if any, into this suit as the governing law, dependent upon the date and nature of relevant litigation events. 29 U.S.C. §§ 1114 & 1144. Whether a patchwork of state and federal authorities will control the action's outcome—state or other federal law filling any spaces left by ERISA's self-confined application—hinges upon this penetration finding.

The instant parties and pension plan satisfy the first set of fundamental ERISA qualifications. A declared ERISA policy is to protect "the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for [their] fiduciaries . . .." 29 U.S.C. § 1001(b). Section 1109 provides for the personal liability of plan fiduciaries who breach any of their duties. This court has exclusive jurisdiction of this action without respect to the amount in controversy or the citizenship of the parties. 29 U.S.C. § 1132(e)(1) & (f). The Fund is a covered employee benefit plan. 29 U.S.C. § 1002(3). Plaintiff Gilliam, a participant and beneficiary of the Fund, 29 U.S.C. § 1002(7) & (8), is empowered to bring this action for fiduciary breach pursuant to ERISA's civil enforcement provisions. 29 U.S.C. § 1132(a)(2) & (3). Edwards, as fiduciary in the roles of Fund administrator and trustee,

29 U.S.C. § 1002(21)(A), is a party in interest. 29 U.S.C. § 1002(14)(A).

ERISA's stucco scheme of effective dates necessitates a secondary determination of its application and activation. ERISA fiduciary provisions generally go into effect on January 1, 1975. 29 U.S.C. §§ 1114(a) & 1144(a). Exceptions, however, exist. Section 1106, defining the prohibited transactions plaintiff attributes to Edwards, invites one. Pursuant to the transition rule of § 1114(c)(4), § 1106 shall not apply

(4) Until June 30, 1977, to the provision of services . . . between a plan and a party in interest—

(A) under a binding contract in effect on July 1, 1974 (or pursuant to renewals of such contract), or

(B) if the party in interest ordinarily and customarily furnished such services on June 30, 1974, if such provision of services remains at least as favorable to the plan as an arm's-length transaction with an unrelated party would be and if such provision of services was not, at the time of such provision, a prohibited transaction (within the meaning of section 503(b) of Title 26) or the corresponding provisions of prior law . . . .

The question thus arises whether ERISA, with a general effective date of January 1, 1975 or an exceptional date of June 30, 1977, governs a contract consummated prior to either date on December 12, 1974. If ERISA applies, when will its strictures rouse?

Judge Lacey, in a pretrial memorandum opinion in this action, has already answered both inquiries by upholding ERISA control of Edwards' contract as of January 1, 1975. *Gilliam v. Edwards*, No. 78–1633 (D.N.J. April 2, 1979) (denying defendants' motion to dismiss the complaint for lack of subject matter jurisdiction for failure to state an ERISA claim). The key to ERISA applicability is § 1114(c). Although ERISA explicitly disclaims any effect upon acts prior to January 1, 1975, 29 U.S.C. §§ 1144(b)(1) & 1114(a); *Malone v. White Motor Corp.*, 435 U.S. 497, 499 n. 1, 98 S.Ct. 1185, 1187, 55 L.Ed.2d 443 (1978), § 1114(c)(4) expressly breaks through the technical barrier of January 1, 1975 effectiveness to use 1974 litigation events as guides to ERISA's bearing upon § 1106 claims. Examining ERISA's statutory structure and legislative intent, Judge Lacey reasoned:

Section 1114(c) states that Sec. 1106 shall not apply to binding contracts signed before July 1, 1974 until July 1, 1977. This means that a contract in effect on July 1, 1974, that violates the provisions of Sec. 1106 became unlawful on July 1, 1977. It does not mean that the contract is forever exempt from ERISA, but only that the moment of illegality was delayed. *As a corollary, contracts signed between July 1, 1974 and December 31, 1974 were required to comply with Sec. 1106 on January 1, 1975.*

*Gilliam v. Edwards, supra*, at 4 (emphasis added).

Thus, Edwards' contract, signed on December 12, 1974, fits the Lacey corollary and triggers ERISA's general effectiveness.[6]

---

**6.** *See Marshall v. Craft*, 463 F.Supp. 493, 496–97 (N.D.Ga.1978). The court, similarly denying defendants' motion to dismiss for lack of ERISA subject matter jurisdiction or failure to state an ERISA claim, argued that insulating post-1974 actions from review simply because traceable to an event prior to the Act's effective date is improper given ERISA's comprehensive remedial effort to protect participants and beneficiaries of pension benefit plans.

Importantly, § 1114(c)(4)(B) may contain an alternate route to Judge Lacey's result. Edwards, the party in interest, ordinarily and customarily furnished his administrative services on June 30, 1974, but their provision, now fixed by a largely one-sided contract, does not "[remain] at least as favorable to the plan as an arm's-length transaction with an unrelated party . . . ." Defendants' § 1114(c)(4) argument, seeking the delayed June 30, 1977 effectiveness of § 1106, is misguided. Their focus on Edwards' continued provision of necessary and beneficial *services* to the Fund ignores the unjust contract *terms* securing them. 29 C.F.R. § 2550.414c–4(a) (April 18, 1980). Reasoning that Edwards' agreement was basically fair in that services rendered and salary paid were reasonable, obscures the unfairness of the

In addition to § 1114(c)(4) logic, other principles support ERISA's application and activation. The complaint alleges independent post-January 1, 1975 violations in the form of affirmative actions, enduring fiduciary duties, and losses to the Fund by Edwards' salary drain. *Morrissey v. Curran*, 567 F.2d 546, 548–49 (2d Cir. 1977) (complaint allegations broad enough to encompass claim of present fiduciary violation, since trustees retained a post-January 1, 1975 duty with respect to pre-effective date event); *Marshall v. Craft*, 463 F.Supp. 493, 496 (N.D.Ga.1978); *see M & R Investment Co., Inc. v. Fitzsimmons*, 484 F.Supp. 1041, 1056 (D.Nev.1980), *amended on other grounds*, judgment filed March 11, 1980 (loan executed in December 1974 on the eve of ERISA's effective date barred by §§ 1106(a) & 1114(a) as of January 1, 1975). The fear of *Martin v. Bankers Trust Co.*, 565 F.2d 1276, 1278–79 (4th Cir. 1977) that the concept of "continuous breach" undermines § 1144(b)(1) is impertinent; *Martin*, unlike this case, involved main events definitively completed prior to ERISA's signing into law and a negative failure or omission as the post-January 1, 1975 act.

ERISA's uneven temporal regulation of pension claims leaves a span of litigation time yet unaccounted for. A twenty-day gap remains, measured from the contract's execution on December 12, 1974 through December 31, 1974, the day before ERISA's appearance in this suit. Since Congress, pre-ERISA, did not preempt state pension plan regulation, but endeavored to preserve that power to the states, *Malone v. White Motor Corp.*, 435 U.S. at 507, 98 S.Ct. at 1191, state fiduciary law will govern the December 1974 period. Because the federal and state law claims alleged derive from a common nucleus of operative fact, and would ordinarily be tried in a single judicial proceeding, this court exercises its pendent jurisdiction over the state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

## II

*ERISA Fiduciary Standards* (January 1, 1975 to the present)

ERISA is a comprehensive remedial statute primarily designed to protect individual pension rights. H.R.Rep.No.533, 93d Cong., 2d Sess. 3, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4639, 4639; *Marshall v. Snyder*, 430 F.Supp. 1224, 1231 (E.D.N.Y.1977), *aff'd and remanded*, 572 F.2d 894 (2d Cir. 1978). To fulfill its curative aim, ERISA should be given a liberal construction to safeguard the interests of Fund participants and beneficiaries and to preserve the integrity of Fund assets. *Marshall v. Kelly*, 465 F.Supp. 341, 349 (W.D.Okla.1978). Federal courts have authority to create principles of employee benefit law in accordance with the policies propelling ERISA. *See In re C. D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1131 (E.D.Pa. 1977), *aff'd*, 582 F.2d 1273, 1275 (3d Cir. 1978).

ERISA particularizes new and stringent precepts of minimum fiduciary conduct for pension plan trustees and administrators to prohibit conflicts of interest and prevent actual or potential misuse of funds. 29 U.S.C. §§ 1101–1114; H.R.Rep.No.533, *supra*, at 4655; S.Rep.No.127, 93d Cong., 2d Sess. 3, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4838, 4839. The rules address the required degree of fiduciary responsibility and accountability governing the management and disposition of pension funds. Section 1104(a)(1), which imposes an overall requirement upon trustees to discharge all of their duties "solely in the interest of the participants and beneficiaries," establishes the foundation obligations of all ERISA fiduciaries. *Marshall v. Snyder*, 430 F.Supp. at 1231; *Winpisinger v. Aurora Corp.*, 456 F.Supp. 559, 566 (N.D. Ohio 1978). Section 1106 supplements these fundamental standards by expressly prohibiting specific transactions. *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978). Offsetting the duties and prohibitions are the exemptions of § 1108.

contract itself, which locked the Fund into Edwards' ten-year performance or his disassocia-

tion in the event he exercised his sole renewal or termination options.

Plaintiff alleges Edwards' dual violation of § 1106:

(a) Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(C) furnishing of goods, services, or facilities between the plan and a party in interest

(b) A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account

Of § 1106(a)(1)(C), plaintiff asserts that Edwards caused the plan to enter into the December 12, 1974 contract fully aware that it constituted the furnishing of services between the plan and a party in interest, himself. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 8. Secondly, as fiduciary, Edwards dealt with the plan assets "in his own interest or for his own account." 29 U.S.C. § 1106(b)(1); Plaintiff's Proposed Findings at 9. Plaintiff further argues that Edwards, if himself not a violator of these provisions, is nonetheless liable for the breach of fiduciary responsibility by his co-trustee Parsonnet. 29 U.S.C. § 1105(a); Plaintiff's Proposed Findings at 9–10.

Section 1108(b)(2) & (c)(2) contain the exemptions relevant to relieving Edwards from the consequences of his allegedly forbidden § 1106 behavior:

(b) The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

(2) Contracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

(c) Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

(2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred . . . .

Crucial to an exemption determination is recognition that § 1108(b)(2) provides no shelter for § 1106(b)(1) acts—"self-dealing" transactions involving conflicts of interest—relating to fiduciaries dealing with plan assets in their own interest or for their own account. 29 C.F.R. § 2550.408b–2(a) (April 18, 1980); Panel Discussion, Prohibited Transactions, 31 Bus.Law. 143, 148 (1975). If, as here, the furnishing of services involves a § 1106(b) act (for example, if Edwards, a fiduciary and party in interest, provides § 1106(a) services to the plan under a contract drawing plan assets as compensation in his interest or for his account—the § 1106(b) act), this act is a separate transaction not exempt under § 1108(b)(2). 29 C.F.R. § 2550.408b–2(e)(1); *Marshall v. Kelly*, 465 F.Supp. at 353–54. The regulations's rationale:

The prohibitions of section 406(b) supplement the other prohibitions of section 406(a) of the Act *by imposing on parties in interest who are fiduciaries a duty of undivided loyalty to the plans for which they act.* These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which *may*

*conflict* with the interests of the plans for which they act. In such cases, *the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.*

29 C.F.R. § 2550.408b–2(e)(1) (emphasis added). Section 1106(b) thus creates a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans. *Cutaiar v. Marshall*, 590 F.2d 523, 529–30 (3d Cir. 1979).[7] In essence, a combined reading of §§ 1106 and 1108 and the relevant regulation suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered—this rule is preserved by the § 1108 exemption—may not if self-dealing is involved in the transaction securing the payment.

▪ In violation of his § 1106(b) "duty of undivided loyalty" to the Fund entrusted to his care, Edwards caused the plan to engage in a transaction he knew constituted a direct furnishing of services between the plan and himself, in his interest. 29 U.S.C. § 1106(b)(1) & (a)(1)(C); 29 C.F.R. § 2550.-408b–2(a), (e)(1) & (2); *see Marshall v. Kelly*, 465 F.Supp. at 353 (defendant dealt with plan assets in his own interest in violation of § 1106(b)(1) by causing, among other acts, the plan to make a $9,000 payment to himself). No exemption applies. 29 C.F.R. § 2550.408b–2(a), (e)(1) & (2). Edwards, as Fund trustee, actively participated in, perhaps initiated, the discussions leading to his employment as Fund administrator. He made no attempt to disqualify himself or extract himself from these considerations, but instead exerted a guiding force at trustees meetings to encourage their awarding him the contract. Sensitive to obtaining a beneficial arrangement, Edwards consulted with the contract's author, Parsonnet, about its provisions before its completion, fully aware that Parsonnet was trustee and attorney to the Fund, but nonetheless reliant upon him to protect his and the Fund's divergent interests. The final contract is markedly one-sided. It chains the Fund to Edwards' ten-year term or self-initiated decision to step down should he exercise his renewal or termination option—Edwards' sole prerogative.

These facts clearly indicate Edwards' abandonment of his fiduciary obligation to secure for the Fund the best contract possible. In a § 1106(b) context, the Third Circuit has required plans to be represented "by trustees who are free to exert the maximum economic power manifested by their fund whenever they are negotiating a commercial transaction." *Cutaiar v. Marshall*, 590 F.2d at 530. A leading trust authority observed:

> Reasons behind the establishment of the loyalty rule by equity are that it is generally, if not always, humanly impossible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction. Consciously or unconsciously he will favor one side as against the other, where there is or may be a conflict of interest. If one of the interests involved is that of the trustee personally, selfishness is apt to lead him to give himself an advantage. If permitted to represent antagonistic interests the trustee is placed under temptation and is apt in many cases to yield to the natural prompting to give himself the benefit of all doubts  .   .   .  .

G. Bogert, Trusts and Trustees § 543, at 475–76 (2d ed. 1960). The Fifth Circuit Court of Appeals in *Fulton National Bank v. Tate*, 363 F.2d 562, 571–72 (5th Cir. 1966) aptly expanded this position:

> [T]he beneficiary need only show that the fiduciary allowed himself to be placed in a position where his personal interest *might* conflict with the interest of the beneficiary. It is unnecessary to show that the fiduciary succumbed to this

---

7. The apparent harshness of this rule is mitigated by § 1108(a), which permits the Secretary of Labor to grant exemptions from § 1106(b) restrictions if special formal procedures are followed.

temptation, that he acted in bad faith, that he gained an advantage, fair or unfair, that the beneficiary was harmed. . . . [The sole purpose and effect of the rule] is prophylactic: the fiduciary is punished for allowing himself to be placed in a position of conflicting interests in order to discourage such conduct in the future.[8]

(Emphasis in original)

In light of Edwards' § 1106(b)(1) violation and the inapplicability of the § 1108(b)(2) exemption, the next question is whether the § 1108(c)(2) exemption excuses his § 1106(b)(1) behavior, since no regulation explicitly precludes its operation. Regulation § 2550.408c–2(a) (April 18, 1980), however, intimates that § 1108(c)(2) and § 1106(b)(1) do not interact: This section refers to § 1108(c)(2) as merely *clarifying* what constitutes the reasonable compensation for the services mentioned in § 1108(b)(2), thus robbing § 1108(c)(2) of independent exemptive power. Nonetheless, the § 1108(c)(2) excuse, even if distinctly operative, fails for Edwards. A fiduciary already receiving full-time pay from certain sources cannot, by command of this section, receive reasonable plan compensation. 29 U.S.C. § 1108(c)(2); 29 C.F.R. § 2550.408c–2(b)(2). Edwards' business-agent salary entitlement from the union—an employee organization whose members are plan participants—was substantial enough to qualify as full-time pay for purposes of the fiduciary rationale of the rule. ERISA focuses, not on the hours devoted to the second job or function, but on the amount of payment received. Its aim is to prevent double payment from a party in interest, S.Rep.No. 383, 93d Cong., 2d Sess. 3, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4890, 4983, and thus avoid the conflicts dual allegiances may spark. A weekly salary of even $250 is sufficient to create an impermissible interest tension.

To argue that Edwards gained the § 1108(c)(2) exemption when he lost his business manager position in June 1976 ignores the strict standards of propriety guiding the law of trusts. A retroactive or subsequent validation of a stained contract would undermine the prophylactic power of ERISA's stringent trust standards.

Even absent the § 1106(b)(1) transgression, Edwards violated § 1106(a)(1)(C). This section, which prohibits transactions between a fiduciary and certain parties in interest, also applies to self-dealing situations where the fiduciary is a party in interest, as here. *Marshall v. Kelly*, 465 F.Supp. at 350–51. The § 1108(b)(2) exemption, potentially operative, fails to free Edwards from liability. Regulation § 2550.408b–2 delineates three requirements for the general statutory exemption for services to prevail: (1) the services must be necessary for the establishment or operation of the plan; (2) the services must be furnished under a reasonable contract or arrangement; *and* (3) no more than reasonable compensation is paid for the services. Edwards undoubtedly supplied necessary services to the Fund that are "appropriate and helpful . . . in carrying out the purposes for which the plan is . . . maintained." 29 C.F.R. § 2550.408b–2(b).

Edwards' contract with the Fund, however, falls short of the reasonableness requirement. Regulation § 2550.408b–2(c) provides in pertinent part:

No contract or arrangement is reasonable within the meaning of section [1108(b)(2)] of the Act and § 2550.408b–2(a)(2) if it does not *permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances* to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

(Emphasis added). Edwards has the sole termination option; the Fund, therefore, may become trapped into a harmful predicament, a consequence the regulation expressly seeks to prevent. The reasonable compensation requisite of 29 C.F.R. § 2550.408b–2(a)

---

**8.** Resultant harm is unnecessary for ERISA violations since Congress sought to prevent transactions providing a high potential for loss of plan assets or insider abuse. *Marshall v. Kelly*, 465 F.Supp. at 354.

(3), (d) and § 1108(c)(2) is not satisfied as well. Why is previously explained.

ERISA §§ 1102(c)(1) and 1108(c)(3) cannot redeem Edwards in the face of either § 1106 violation. These sections provide:

§ 1102(c) Any employee benefit plan may provide—

(1) that any person or group of persons may serve in more than one fiduciary capacity with respect to the plan (including service both as trustee and administrator) . . . . .

. . . . .

§ 1108(c) Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

. . . . .

(3) serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

Although these rules indicate that ERISA tolerates some degree of collateral interest, *Culinary Workers & Bartenders Union No. 596 Health & Welfare Trust v. Gateway Cafe, Inc.,* 91 Wash.2d 353, 588 P.2d 1334, 1341 (1979) (commenting upon § 1108(c)(3)), they are not licenses to conduct prohibited transactions. *Marshall v. Snyder,* 572 F.2d 894, 901 (2d Cir. 1978) (commenting upon § 1108(c)(3)). Here, much more transpired than a fiduciary merely holding two positions; this fiduciary actively pursued and discussed the design of his own employment contract, secured in partial self-interest without proper regard for the interests of the Fund.

In the November 7, 1951 Agreement and Declaration of Trust establishing the North Jersey Asphalt Workers' Local 889 Welfare Fund, provision is made in Article VI, § 3 "to compensate one or more Trustees for special executive or administrative services performed in connection with the direction, administration or operation of the Trust, the Fund, or the Policies." However, even § 1102(c)(1) coupled with this language in

the plan instrument permitting dual service cannot override the exacting standards of § 1106 or the inequities of self-dealing. More generally, the secondary importance of certain plan terms is further emphasized by ERISA § 1110(a): Except as specified in § 1105, any provision of the instrument purportedly relieving a fiduciary from responsibility or liability for any obligation or duty contained in ERISA's fiduciary scheme is void as against public policy.

Therefore, under ERISA's strictures, which receive liberal construction to protect the participants, beneficiaries, and assets of the Fund, I find that Edwards breached his fiduciary duty to the Fund for the period of ERISA's effectiveness, January 1, 1975 to the present.

### III

*New Jersey Fiduciary Standards* (December 12–31, 1974)

ERISA and New Jersey state trust law relevant to pension plans share a homogeneous base. ERISA's fiduciary responsibility section essentially codifies select principles evolved in the law of trusts in order to foster interstate uniformity and predictability. H.R.Rep.No.533, *supra,* at 4649, 4650; *Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986, 990 (E.D.N.Y. 1978). Its principles of fiduciary conduct derive from existing trust law but are aptly modified for employee benefit plans. H.R. Rep.No.533, *supra,* at 4651; 120 Cong.Rec. 29932 (1974) (remarks of Sen. Harrison Williams).

New Jersey law, mirroring essential ERISA fiduciary requirements, establishes that trustees appointed to administer employee welfare or pension plans must be judged by the same strict common law standards as a fiduciary administering a trust. *Thompson v. Sheet Metal Workers Union # 13,* 132 N.J.Super. 348, 355, 333 A.2d 572 (Ch.Div. 1975).[9] *Thompson* expressly acknowledged Congress' legislative purpose to reinforce,

---

**9.** Citing ERISA, though not applying it, *Thompson* noted that the Act "leaves little doubt that administrators and trustees of the plan are fi-

duciaries." 132 N.J.Super. at 355, 333 A.2d at 576.

not alter, the duty of undivided loyalty to the beneficiaries, "the most fundamental duty" owed by a trustee. *Thompson v. Sheet Metal Workers Union # 13,* 132 N.J. Super. at 355, 333 A.2d 572. The Tenth Circuit noted that ERISA § 1104(a) embodies "a carefully tailored law of trusts, including the familiar [requirement] of undivided loyalty to beneficiaries. . . ." *Eaves v. Penn,* 587 F.2d at 457; ERISA regulation § 2550.408b–2(e)(1), central to this decision, explains that § 1106(b) prohibitions impose "on parties in interest who are fiduciaries a duty of undivided loyalty to the plans for which they act."

■ Under New Jersey law, a fiduciary responsible for trust administration may be compensated for the fiduciary services themselves. *Silverstein v. Last,* 156 N.J.Super. 145, 155, 383 A.2d 718 (App.Div. 1978); *Strawbridge v. Strawbridge,* 35 N.J. Super. 125, 127–28, 113 A.2d 199 (Ch.Div. 1955). Nonetheless, it is the duty of the trustee to administer the trust solely in the interest of the beneficiaries. *Branch v. White,* 99 N.J.Super. 295, 306, 239 A.2d 665 (App.Div.), *certif. denied,* 51 N.J. 464, 242 A.2d 13 (1968). The trustee may not assume a position where he might benefit from violating his duty to the beneficiaries, *In re Koretzky,* 8 N.J. 506, 528, 86 A.2d 238 (1951); *Liberty Title & Trust Co. v. Plews,* 6 N.J. 28, 39–40, 77 A.2d 219 (1950); 2 Scott On Trusts § 170, at 1298 (3d ed. 1967), or where self-interest might induce relaxation of his trust obligation or pit his own advantage against the trust welfare. *In re Westhall,* 125 N.J.Eq. 551, 554, 5 A.2d 757 (Ct. Err. & App.1939). The rule which forbids fiduciaries from dealing in their own behalf on trust matters operates independently of fraud or good intention. *In re Koretzky,* 8 N.J. at 529, 86 A.2d 238; *In re Kline,* 142 N.J.Eq. 20, 20, 59 A.2d 14 (Ct.Err. & App. 1948). The court in *Camden Trust Co. v. Cramer,* 136 N.J.Eq. 261, 266, 40 A.2d 601 (Ct.Err. & App.1945) concisely explained:

It is both sound law and good morals that a fiduciary may not, in case of conflict, subordinate the *cestui's* interest to his own. Undivided loyalty is of the very essence of the relationship. The trustee is under a peremptory duty of complete loyalty and fidelity to the *cestui.* Self-interest can never be the determinative. He cannot serve two masters in an area of service involving divergent and discrepant interests.

See also *Bankers Trust Co. v. Bacot,* 6 N.J. 426, 437, 78 A.2d 904 (citing this excerpt with approval).

■ Edwards, in negotiating and securing his contract with the Fund, failed to satisfy these demanding standards of the common law. Caught in the crossfire of dual interests, he breached his fiduciary duty to the Fund under state law tests. The December 12, 1974 contract stands as a monument of his defection. I therefore conclude that Edwards neglected his fiduciary responsibilities under ERISA and New Jersey state law for the entire period of December 12, 1974 to the present.[10]

IV

*Relief*

■ ERISA § 1109(a) captures Congress' intent to arm the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty. *Eaves v. Penn,* 587 F.2d at 462. According to its terms, a fiduciary who violates any fiduciary obligation shall be personally liable for resultant losses to the plan and for restoration of profits contingent upon the illegal use of plan assets. A delinquent fiduciary shall also be subject to other equitable or remedial relief deemed appropriate by the court, including removal. Thus, ERISA grants the court wide discretion in fashioning legal and equitable relief to make the plan whole and protect the rights of the beneficiaries, including recis-

---

10. This determination eliminates the need to consider plaintiff's claims of contract uncon-

scionability and Walker's invalid appointment.

sion of unlawful transactions and recovery of monetary loss to the plan. 29 U.S.C. § 1109(a); *Marshall v. Kelly*, 465 F.Supp. at 354; *Marshall v. Snyder*, 572 F.2d at 901.

■ The relevant principles of traditional trust law make a trustee who violates his duty of loyalty chargeable with any loss to the value of the trust estate resulting from the breach. *In re Imperial "400" National, Inc.*, 456 F.2d 926, 931 (3d Cir. 1972); Restatement (Second) of Trusts § 206, Comment a (1959); 3 Scott On Trusts § 206, at 1675 (3d ed. 1967). Thus, both ERISA and the common law recognize the personal liability of the offending fiduciary. A trustee liable for the wrongful disposition of trust funds is also chargeable with interest thereon. *State v. National Surety Corp.*, 17 N.J. Super. 137, 141, 85 A.2d 534 (App.Div.), *certif. denied*, 9 N.J. 287, 88 A.2d 39 (1952); 3 Scott On Trusts § 207.1, at 1678; Restatement (Second) of Trusts § 207(1). Determining the rate of interest recoverable is within the court's discretion, equitably exercised in light of the character of the breach and the degree of fault. *State v. National Surety Corp.*, 17 N.J.Super. at 141, 85 A.2d 534; 3 Scott on Trusts § 207.1, at 1678–79; Restatement (Second) of Trusts § 207(1), Comment c. Edwards' overall earnest devotion to, and promotion of, the Fund are factors to be considered in molding the interest award.

■ As a result of Edwards' breach of fiduciary duty, the Fund has lost the salary he derived from the December 12, 1974 contract. In accordance with the protective and preventative trust rules of ERISA and the common law of New Jersey, and the wide remedial discretion of this court, I conclude:

(1) Edwards' December 12, 1974 contract with the Fund is rescinded, and

(2) Edwards must repay the Fund the salary he received under this contract, plus interest.

Plaintiff will submit an order which sets forth the liquidated damages, plus interest, within ten days. No costs.