Salvatore J. LASCALA, Douglas A. Janese, and Richard J. Marino, individually, as members of Niagara–Genesee & Vicinity Carpenters Local 280, and as participants and Trustees or former Trustees of the Local 280 Welfare and Pension Funds, Plaintiffs,

v.

Santo S. SCRUFARI, individually and as Plan Manager of the Niagara–Genesee & Vicinity Carpenters Local 280 Welfare and Pension Funds, Defendant.

No. 93–CV–982–C.

United States District Court,
W.D. New York.

Jan. 14, 2004.

Opinion Granting Reconsideration
July 23, 2004.

Timothy A. McCarthy, Buffalo, NY, for Plaintiffs.

Michael T. Harren, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, Robert A. Doren, Bond, Schoeneck & King, PLLC, Buffalo, NY, for Defendants.

CURTIN, District Judge.

This action was instituted on December 10, 1993, charging several violations of federal labor law and the Employee Retirement Income Security Act of 1974 ("ERISA"). Jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1337, and the action is authorized under ERISA Section 502(a)(2) and (3), 29 U.S.C. § 1132(a), (3).

Most of the issues in the case have been disposed of by motion. The issue remaining to be resolved is whether defendant Santo Scrufari, as Plan Manager of the Niagara–Genesee & Vicinity Carpenters Local 280 Welfare and Pension Funds, breached his fiduciary duties under ERISA by unilaterally increasing his and his son's compensation without Trustee approval. Plaintiffs also seek an order di-

recting that any amounts unlawfully obtained be returned to the appropriate Fund. Scrufari does not deny that the monies were paid, but contends they were authorized to be paid and were reasonable.

A non-jury trial on this issue was held in December 2002, and the court has received post-trial submissions and heard summations. The following constitutes the court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

This action involves the operation and management of a Pension Fund and a Welfare Fund which were established by Trust Agreements among the Fund Trustees, Carpenters Local 280, and the Building Industry Employers Association of Niagara County, New York, Inc. Each of the Trust Agreements designates the Trustees as the fiduciaries of the Funds and vests all authority in them, including the authority to appoint a Fund Manager to oversee the day-to-day operations of the Fund (*see* Ex. 1 (Pension Fund), p. 13; Ex. 2 (Welfare Fund), p. 11).[1] Specifically, the Agreements provide:

> The Trustees may designate a salaried Fund Manager and/or Agent to perform the operational functions of the Fund at the direction and in accordance with procedures established by the Trustees. The Fund Manager and/or Agent so chosen need not, but may, be a Trustee. Any Fund Manager and/or Agent so designated shall perform only such duties and have only such authority as may be delegated to him by the Trustees.

(*Id.*). The Agreements also grant the Trustees the authority "[t]o incur and pay the ordinary necessary expenses of adminis-

tration," including the salaries of Fund or Plan Office employees (Ex. 1, p. 17; Ex. 2, p. 15).

The Agreements provide that there are five Union-side Trustees and five employer-side Trustees on each Fund (*see, e.g.,* Ex. 1, p. 9), and establish a voting procedure in which the Trustees can only act through resolutions adopted by majority vote (*id.* at p. 11). Specifically:

> All decisions of the Trustees shall be by majority vote of the quorum and must include the concurring vote of at least two (2) Trustees from each group of Trustees. Whenever a deadlock shall exist as to a proposal, nomination, motion, or resolution, or whenever a quorum is lacking and at least two (2) Trustees from either group shall notify the remaining Trustees, in writing, in either of the foregoing cases, that there is a deadlock either by reason of a lack of qualified Trustees or failure to agree on the items set forth hereinabove, and it shall appear that the deadlock cannot be broken, the respective groups of Trustees shall meet immediately to agree on an umpire to decide the matters in question.

(*Id.*). If there is a vacancy on the Board or if any Trustee is absent from a meeting, the minority shall be allowed the vote or votes of the absent Trustees, so that the voting rights of the minority group shall equal the majority (*id.* at p. 10).

At trial, the plaintiffs presented the minutes of several Trustee meetings which took place between approximately September 1982 and April 1993, and also called as witnesses defendant Santo Scrufari; David Herrmann, the attorney for the Funds; Michael Weber, an employee of Peter J. Scrufari Construction, Inc.; Thomas

---

1. Unless otherwise indicated, references to "Ex." are to the exhibits submitted to the court by the parties as joint trial exhibits.

Hartz, a management-side Trustee since approximately 1981, Sarkee Sanoian, the General Business Agent of Local 280 and a Trustee of the Funds from approximately 1981 to 1993; and plaintiff Douglas Janese, a Union-side Trustee from approximately 1991 to 1993. Defendant called Angelo Massaro, a company-side Trustee since 1985, and defendant's son Russell Scrufari, who was a Fund office employee from approximately 1984 until 1996, when he became the Fund Manager.

The events in question occurred roughly between 1982 and 1993. For the most part, the essential facts are not in dispute, but the recall of many of the witnesses as to details has been eroded by the passage of time. At times there appeared to be conflict or variance between the witnesses' trial testimony, deposition testimony, and position taken at a meeting as reflected in the minutes.

The evidence at trial established that as of December 1983, Santo Scrufari had been a Trustee for eleven years and was the most experienced of the Union-side Trustees. He also had over twenty years' experience as a carpenter, foreman, and superintendent. From 1979 to 1984 he was employed by Peter J. Scrufari Construction, Inc., a company owned by his wife, Charlene. From approximately 1981 to 1984, he served as president of Local 280. In the fall of 1982, he met with Sarkee Sanoian and Douglas Janese to seek their help in obtaining the position of Plan Manager of the Funds. At the time, Sanoian was the business agent for Local 280 and a Union-side Trustee, and Janese was a member of Local 280 (Tr. at 16–17, 23, 70, 212, 218–19, 241–43).[2]

At a Trustees' meeting held on September 30, 1982, Sanoian suggested that the current Plan Manager, Lorelei Collins, be replaced by a Union member trained in collection procedures, and asked her when she expected to retire. She replied that she planned to stay for seven years unless the Social Security rules changed (Ex. 4, pp. 1–2). Collins had been Plan Manager for many years, and Scrufari testified that, in his opinion, she had done an excellent job (Tr. at 25).

At a meeting of the Trustees on February 10, 1983, Sanoian pointed out that the Laborers Local 91 had a Union member in their Fund office and that this Fund should do the same. J.C. Bullock, Jr., an employer-side Trustee, opposed naming a carpenter as Plan Manager because, in his view, a carpenter would not have the experience to manage the office, the salary would be too high, and "a carpenter in the Fund office would not be politically impartial" (Ex. 5, p. 2). Bullock stated further that, as long as he was a Trustee, he would not vote for a Union carpenter to be employed in the Fund office (id.).

Lorelei Collins did not stay for seven years; she suddenly resigned on October 10, 1983. At the time of her resignation she was paid $385 per week, or $9.63 per hour (Exhibit 8, p. 2). At a Trustees' meeting on October 21, 1983, Sanoian stated that "he was at a loss to understand why Mrs. Collins had resigned other than for health reasons" (Ex. 7, p. 2). Several management Trustees suggested that her health problems were aggravated by treatment she had received from some Union members. Sanoian said that it was not unusual for a Plan Manager to be criticized and to have to deal with irate members (id.).

The minutes of the October 21, 1983 meeting also reflect that, as a temporary measure, the office committee of the Board

2. References preceded by "Tr." are to pages of the trial transcript, entered on the court's docket as Items 183–185.

authorized Kathy Vance to be acting "plan administrator," with a 10 percent increase in pay. Notwithstanding the dissatisfaction expressed by several Union-side Trustees at not being notified about the office committee's action, a motion to approve the salary increase for Ms. Vance "to assume the post of acting plan administrator" was unanimously carried (*id.*).

Also at the October 21, 1983 meeting, a Union-side Trustee filed a motion to appoint Santo Scrufari as the permanent Plan Manager. The vote was deadlocked, with five employer-side Trustees and five Union-side Trustees (including Scrufari) voting. When Leonard O'Sullivan, one of the actuaries of the Funds, pointed out that there were some funds that had Union members as administrators, Mr. Bullock suggested that it was often the norm to have a neutral party act as manager of jointly administered funds. Another deadlock vote resulted when a second motion was made to appoint Scrufari as acting Plan Manager, once again with Scrufari voting (*id.*).

At the meeting of December 15, 1983, Scrufari was not present since he was no longer a Trustee, having resigned as president of the Local. On the question of the Plan Manager position, Sanoian noted that in New York State, thirteen Plan Managers were carpenters. He again cited Scrufari's long experience with the Union and as a Trustee in support of his view that Scrufari should be appointed. Importantly, the minutes clearly reflect Sanoian's position that "Scrufari was qualified for the job and should be paid journeyman's wages for it" (Ex. 8, p. 2). When a vote to reconsider the deadlocked motion to appoint Scrufari as Plan Manager was also deadlocked, it was agreed that the question be referred to an already scheduled arbitration of a dispute concerning a pension benefit increase (*id.*).

Scrufari was present at the meeting of March 9, 1984, having been reseated as a Trustee as of December 21, 1983. After several Union members expressed dissatisfaction with the actions of Kathy Vance as acting Plan Manager, two motions followed and both deadlocked. One was to put Scrufari in the Fund office along with Kathy Vance, and the other was to fire Vance. Since the votes deadlocked, it was evident that Scrufari voted on both motions (*see* Ex. 9, pp. 7–8).

Sometime shortly after the meeting of March 9, 1984, Kathy Vance and her assistant, Anne Abraham, resigned. An "emergency" meeting was held on March 20, 1984 to address these resignations. During the meeting, a motion made by Scrufari to accept the resignations carried, and a subsequent motion made by Union-side Trustees to appoint Scrufari as acting Plan Manager deadlocked (*see* Ex. 10).

As reflected in the minutes, Scrufari did not excuse himself from the votes on the motions to fire Kathy Vance and to make himself Plan Manager. On at least five occasions he was present and, since the votes were deadlocked, it must be presumed that he voted on these issues. At trial Scrufari admitted that he did not excuse himself but claimed that he sat mute during the votes (Tr. at 38–39). However, there is nothing in the record to note his abstention from these votes.

At the March 20, 1984 meeting following Kathy Vance's resignation, the Trustees appointed the Funds' actuaries, Maloney & O'Sullivan, as "Acting Plan Manager" effective in April 1984 (*see* Ex. 10). Maloney & O'Sullivan immediately hired Scrufari, still a Union-side Trustee, to supervise and run the Plan office. This hiring was not addressed by the Trustees, but was made by Leonard O'Sullivan directly (*see* Tr. at 27–29). Scrufari testified at trial that, as Maloney & O'Sullivan's employee, he was

effectively "Plan Manager" of the Funds (Tr. at 28). However, the minutes from this period identify Scrufari only as Union-side Trustee (*see, e.g.,* Ex. 12, p. 1; Ex. 13, p. 1; Ex. 14, p. 1). In any event, Maloney & O'Sullivan compensated Scrufari for his services, and billed the Funds (Ex. 12, p. 7; Tr. at 29, 316–17).

There is a continuing dispute central to this case regarding what pay was authorized and what pay Scrufari actually received. It was generally agreed that the Carpenters Union scale also applied to the Plan Manager's salary. The lowest wage rate for Union scale carpenters was the "Journeyman" or "Carpenter" rate. The "Foreman" rate was 10 percent above Carpenter, and the "General Foreman" rate was 10 percent above Foreman (Ex. 22, pp. 13–14). There was also a "General Agent" rate which was 10 percent above the General Foreman rate, but this was not part of the collective bargaining agreement. It was paid only to Sanoian as General Agent of the Union pursuant to the by-laws of Local 280 (*see* Tr. at 215).

Scrufari testified that when Leonard O'Sullivan asked him what he wanted to be paid, he called in an amount to Maloney & O'Sullivan's payroll department (Tr. at 35–36). At trial Scrufari was initially evasive as to exactly what that amount was. Although discussion at the Trustees' meetings had suggested that he would receive a salary based on the Journeyman's rate if the Union-side Trustees were successful in the arbitration (*see, e.g.,* Ex. 8, p. 2), he testified that as the employee of Maloney & O'Sullivan he was entitled to whatever amount he happened to have been making at the time as superintendent for Peter J. Scrufari Construction, Inc. (Tr. at 29). Scrufari further asserted that as a "Superintendent," his rate of pay would have been "negotiable," and that such "negotiable rate of pay was commonly ten percent above the general foreman's rate" (Tr. at 33). While Scrufari testified that the term "Superintendent" designates a rate of pay under Local 280's collective bargaining agreement, as noted previously the agreement only specifies wage rates for "Carpenter," "Carpenter Foreman," and "Carpenter General Foreman," but not "Superintendent."

In any event, it was eventually determined during trial that the rate of pay Scrufari received from Maloney & O'Sullivan was the General Foreman rate-not the Journeyman or Foreman rate (Tr. at 36–37, 81). In March 1984 when he began employment with Maloney & O'Sullivan, the General Foreman rate was $18.43 per hour. At that time, the Journeyman rate was $15.23, or about three dollars less (*see* Exs. 23, 32).

The exact pay that Scrufari was to receive from O'Sullivan, and later directly from the Funds, was never considered by the Trustees, either at the beginning when Scrufari was paid at the General Foreman rate or later when his pay was raised to the General Agent rate (10 percent above General Foreman) (*see* Tr. at 80–81; Exs. 3, 24). Instead, Scrufari repeatedly insisted he had an agreement with Sanoian that he would always be paid at the same rate as Sanoian (Tr. at 39, 49, 58, 69, 75, 92). Sanoian denies any agreement with Scrufari about his Plan Manager compensation, pointing out that he was "just one vote on the Board of Trustees" (Tr. at 225). In any event, there is nothing in the record to suggest that the Board delegated to Sanoian the authority to fix Scrufari's salary.

Shortly after Scrufari became Maloney & O'Sullivan's employee in March 1984, the arbitrator issued his decision which was favorable to the Union-side Trustees on the issue of appointing Scrufari as Plan Manager and unfavorable on the pension benefit increase. The decision was accepted by the Trustees without further com-

ment at their May 2, 1984 meeting (Ex. 14, p. 1). However, Scrufari continued to work for Maloney & O'Sullivan for "almost a year" without any move by the Board to make him Plan Manager (Tr. at 37). At the meeting on July 23, 1984, after a discussion about administrative costs, a suggestion was made by a company-side Trustee that a study be undertaken to determine what the projected administrative costs would be. However, no motion was made, and no study followed (Ex. 12, pp. 7–8).

At the March 7, 1985 meeting, from which Scrufari was absent, the following resolution was passed:

> Motion by Sarkee Sanoian seconded by Merton Marshall to appoint Santo Scrufari as Plan Manager as opposed to the present arrangement with Maloney & O'Sullivan. *His present rate of pay as a salaried employee will remain.* All in favor.

(Ex. 13, p. 3) (emphasis added). Scrufari claims that this resolution of the Trustees, together with the oral agreement he had with Sanoian that he was to receive the same salary as Sanoian, formed the basis of the subsequent wage increases and benefits he received through the years (Tr. at 61–63).

Since Scrufari was absent, there was no one present at the March 7, 1985 Trustees' meeting, except O'Sullivan, who might have known what Scrufari's "present rate of pay" was. In any event, no questions were raised, no one asked O'Sullivan, and Sanoian's motion passed unanimously and without discussion. Sanoian testified that, in referring to Scrufari's "present rate of pay," he meant a salary based on the Journeyman's rate, since that was what he assumed Scrufari was being paid by Maloney & O'Sullivan (Tr. at 213–14). Thomas Hartz, a Union-side Trustee and the only person other than Sanoian who was both present at the March 7, 1985 Trustees'

meeting and testified at trial, expressed his understanding that Scrufari "was to make the same rate that the general business agent was making" (Tr. at 187).

Scrufari testified that he was unable to attend the March 7, 1985 meeting because he was in North Carolina attending his son's graduation from Marine boot camp at the time. Shortly after he returned he read the Sanoian resolution authorizing the continuance of his "present rate of pay" and concluded that, based on the resolution and his asserted agreement with Sanoian, he was justified to take as salary "whatever Mr. Sanoian got," increase by increase, for the remainder of his tenure as Plan Manager (Tr. at 48, 61–63).

As General Agent, Sanoian's rate of pay, although established by Local 280's bylaws and not by the collective bargaining agreement, was linked to the salary increases set forth in the collective bargaining agreement since it was by definition 10 percent above the General Foreman's rate. Scrufari claims that his salary increases were likewise tied to the collective bargaining agreement as a result of his understanding with Sanoian, and thus were authorized without requiring Trustee approval (*see* Tr. at 55, 72, 74). In fact, he testified that he believed the Funds were actually a signatory to the collective bargaining agreement (Tr. at 105). However, there is no support in the record for this assertion, and Scrufari admitted at trial that there is nothing in Sanoian's March 7, 1985 resolution expressly linking Scrufari's pay to the collective bargaining agreement (Tr. at 59).

On July 1, 1985, three months after becoming Plan Manager, Scrufari increased his pay by $2.05 per hour, from $18.47 to $20.52, without Trustee approval. He admitted at trial that this increase was commensurate to a raise from the General Foreman's rate to the General Agent's

rate, but he had no recollection as to how this might have happened (Tr. at 80–81). In the succeeding four years-up to 1989–he gave himself five additional increases to $22.90 per hour, all without Trustee approval (see Ex. 3, pp. 1–5).

Scrufari also received compensation in the form of "weighted fringes." As Scrufari explained at trial, this compensation represented fringe benefits (such as pension and health care contributions) payable to Fund employees on a weighted scale, to be commensurate with fringe benefits paid to Union members covered by the collective bargaining agreement in order to comply with changes to the Internal Revenue Code (Tr. at 81–88). The question of whether this benefit should be extended to the employees of the Fund first arose at the meeting of February 27, 1989 when Mr. O'Sullivan suggested that the Trustees look into compliance with Section 89 of the Internal Revenue Code (Ex. 15). The question was discussed at greater length at the meeting of February 27, 1989 (see Ex. 57). Then, at the meeting of June 12, 1989, the Trustees approved O'Sullivan's recommendation authorizing the payment of these benefits to employees in the Fund office with an effective date of January 1, 1989 (Ex. 56). As indicated by correspondence in April and May 1990, without any additional approval from the Trustees, Scrufari subsequently awarded himself payment of these benefits retroactive to March 20, 1984, when he began employment with the actuary (see Exs. 32–34).

The evidence presented at trial also shows that Scrufari paid himself overtime without the approval of the Trustees. This payment began on or about March 26, 1989, when Scrufari started to pay himself four hours of time and one-half overtime per week, with a retroactive initial payment of $769.44 (Ex. 3, p. 4; Tr. at 91–94). This amounted to a raise of about 15 percent. He did not inform the Trustees or Mr. O'Sullivan, who was preparing a chart showing salaries paid as of February 1989 to Union employees (including Sanoian) and Fund employees (including Scrufari) (Ex. 15; Tr. at 91–92, 191, 315, 377–79). Scrufari justified this increase because it matched the increase given to Sanoian through a change in the by-laws of the Local (with the approval of the International) and because of his asserted understanding of the meaning of the March 7, 1985 resolution (Tr. at 91–92). Scrufari also testified that Sanoian told him to take the overtime (Tr. at 93–94), but Sanoian denies this assertion (Tr. at 238).

Plaintiffs also presented evidence of the proposed creation of a so-called "Rabbi Trust" in about August 1991–after three additional unauthorized salary increases (to $23.14 and $23.61, and $28.04 per hour, respectively; see Ex. 3) which would have established an additional pension for Scrufari commensurate with the pension benefits Sanoian was receiving (Tr. at 98–100). After discussion by the Trustees, and their acknowledgment that Scrufari was doing "excellent work" and a "superior job" as Plan Manager, the proposal was rejected because it was determined that it would have been too expensive and that Scrufari was adequately compensated (Ex. 90, p. 4; Tr. at 208, 222, 318).

Scrufari testified that the additional pension was Sanoian's idea and that he had no role in drafting the necessary documents (Tr. at 99–100). Sanoian testified that Scrufari first came to him with the proposal (Tr. at 221–22). David Herrmann also testified that Scrufari approached him with the idea of a trust, and sent him a record of his salary history and several "Rabbi Trust" forms so that he could prepare the application (Tr. at 138).

Plaintiff Douglas Janese testified that after he became a Trustee in 1991, he began to question the administrative ex-

penses of the Plan. Before he was a Trustee, he had heard at Union membership meetings that the administrative expenses of the Funds were about eight to ten cents per hour, but after he became a Trustee he learned that the administrative costs were more than a dollar per hour. He testified that at about the same time, Scrufari made a request for an automobile. In making this request, Scrufari submitted that he was not making as much as managers of similar funds and instead of asking for a pay raise, he would accept the benefit of an automobile. Janese suggested that O'Sullivan find out what other Fund Managers were paid so that a comparison could be made (Tr. at 244–47).

As reflected in the minutes for the meeting of October 16, 1992 (Ex. 17), the office committee sent a letter to Scrufari in August 1992 requesting information pertaining to the cost of operation of the Fund office. Sanoian reported that Scrufari refused to furnish the information and said that if the Trustees wanted the information they would have to look for it themselves. The office committee then checked the records and discovered that Scrufari was paying himself four hours of overtime per week. The committee sent another letter to Scrufari in September 1992 ordering him to stop doing so (Ex. 46). As reflected in the payroll records, Scrufari last took overtime for the pay period ending on October 4, 1992 (Ex. 3, p. 8).

It was apparent from the minutes of the October 16, 1992 meeting that no one knew exactly what Scrufari was paid. Sanoian contacted O'Sullivan to ask what Scrufari was paid when he worked in their office, but O'Sullivan responded that he could not find the records. Employer-side Trustee Angelo Massaro "said he was not sure, but he thought that the Fund Manager was paid what the Business Agent was paid" (Ex. 17, p. 1). He asked if any of the Trustees suspected "any malfeasance or

theft," and none did (*id.*). Massaro expressed the view that if Scrufari was paid monies in the past there was nothing that the Trustees could do, since they "had acquiesced to this" (*id.*, p. 2). He suggested that all past payments should be approved, and made a motion "for a full audit to clear the air" (*id.*), but the motion was not seconded.

A series of motions followed addressing the subject of the Plan Manager's pay. First, a motion was approved that no overtime be paid to the Plan Manager. Then another motion followed to set the salary of the Plan Manager at the Foreman's rate. Massaro stated that he felt the position deserved a higher salary. The Union-side Trustees voted for the motion, and the employer-side Trustees voted against it. Finally a motion carried to set the Plan Manager's salary at $59,196.80 per year with a benefit contribution of $11.25 per hour, pending approval by the Funds' attorney. There is nothing in the record to determine how these figures were calculated.

When the Trustees next met on November 5, 1992, all the Trustees were present, along with Scrufari, a representative of O'Sullivan, and David Herrmann, the Funds' attorney (Ex. 18). Scrufari told the Trustees that he had been paying himself four hours of overtime per week for three years and eight months, but stopped the payment upon receiving the letter from the committee. He said that he was entitled to receive overtime because his salary should be the same as that of Sanoian, the General Business Agent of the Union. Scrufari said that when he was hired, Sanoian told him that they were to receive the same salary. Sanoian denied telling him that and denied knowing what pay Scrufari received. O'Sullivan's office reported that when Scrufari was hired by O'Sullivan he was paid at the General

Foreman's rate. Scrufari said that it was no secret what salary he received because it was set forth in the monthly "dues checkoff" as well as in the annual employee refund checks and IRS Form 5500's submitted to the Department of Labor and signed by the Trustees (*id.* at pp. 2–3).

Many questions followed, and Sanoian pointed out that he had no authority to individually set the rate of pay for the Plan Manager. This could only be done by the Trustees. When asked about the responsibility of the Trustees and whether possible overpayments could be recovered, David Herrmann gave the opinion that "it was at best a foggy issue" (*id.* at p. 4). He also stated that he thought the Plan Manager's salary was "tied to the Assistant Business Agent's rate" (*id.* at p. 5). The Trustees decided to leave Scrufari's wage and benefit level as set at the October 16, 1992 meeting, and directed Mr. Herrmann to research the possibility of recovering the overtime payments (*id.*).

The meeting of February 11, 1993 was long and apparently heated at times. Scrufari presented a written response to the questions David Herrmann had posed as a result of the order of the prior meeting. Although Scrufari "said he had given written responses so that his answers could not be twisted" (Ex. 19, p. 3), this document does not appear to be in the record. However, there is a confusing letter which Scrufari sent to "All Trustees" on February 11, 1993 about an apparent confrontation between Janese and Scrufari's son, Russell (Ex. 20). At the conclusion of the letter, Scrufari stated: "I respectfully request ... that my salary be adjusted back to what it was, *General Agent['s salary* which includes the 40 hrs and 4 hrs at time and one half and that you provide the Fund Office with the rental car that the Fund Office previously had." (*Id.* at p. 2).

As reflected in the minutes, Scrufari's written response included charts showing that his benefit rate and that of Sanoian were the same in 1989, but the charts did not reflect the four hours per week overtime. Scrufari contended that the Trustees either knew or should have known that his rate and Sanoian's were the same, and stated that "his job was supposed to be a plush job on [the] side" (Ex. 19, p. 3). Sanoian pointed out that O'Sullivan's payroll records showed that when Scrufari was first hired he was paid 10 percent less than Sanoian. The Trustees grilled Scrufari extensively about authorization for the overtime and for the raises he had received. He was also questioned about bonuses he had given to Fund office employees and raises he had given his son Russell, an employee in the Fund office, without authorization from the Trustees. When asked about giving Fund office employees credit for vacation pay before it was earned, Scrufari said that he would follow the rules in the future (*id.* at pp. 4–5).

Steve Thomas of O'Sullivan Associates presented a report which showed that the administration costs for this Fund were 51 percent higher than the national average in 1988 for funds of similar size and assets (*id.* at p. 6). Sanoian reported on an investigation of other area offices about the expense of administration. He said that in three other offices the per hour expense ranged from 31 cents to 53 cents, compared to $1.22 cents per hour to administer the Local 280 Funds (*id.*). Finally, after much discussion, a motion carried to set the salary of the Plan Manager at a total of $75,088 per year, with wages at $51,688 and fringe benefits at $23,400 per year. Another motion passed requiring the Plan Manager to present a budget with a cost reduction of 30 percent within 30 days (*id.* at p. 7).

The next meeting of April 17, 1993 apparently was the final meeting at which the issues of concern in this case were addressed. There is no record of what happened in the time between the two meetings, but from the tenor of the April 17 meeting it was clear that the parties had reconciled their differences and had given in to Scrufari's demand on almost every issue but overtime. Scrufari's compensation package as Plan Manager was raised to a total of $82,596 per year in salary and fringe benefits. A motion to give him only a one-year contract deadlocked, and a motion was approved to set the wages of Fund office employees at their present level (Ex. 21, pp. 1–2).

Thomas Hartz testified at trial that he has been a company-side Trustee since 1981 or 1982. He works as project manager for the Scrufari Construction Company, which is not affiliated with Santo Scrufari or Peter J. Scrufari Construction (Tr. at 182–83). Hartz testified that when Scrufari was hired by the Funds as Plan Manager in 1985, it was his understanding that Scrufari would be compensated at the General Business Agent rate (Tr. at 187). This is in conflict with statements he made in an interview with the U.S. Department of Labor in July 1994, when he said he believed Scrufari's salary was tied to the Carpenter's Foreman rate, which was 20 percent less than the General Business Agent rate (Tr. at 187–88). Hartz reconciled this conflict by stating that he was unclear about Scrufari's salary at the time of the Department of Labor interview, but later the Trustees reviewed the minutes of meetings which took place in 1988 and 1989 and found statements attributed to O'Sullivan tying Scrufari's salary to the General Business Agent rate (Tr. at 188–89).

Hartz testified that he was unaware of any resolution authorizing the rate of compensation Scrufari actually took, and admits that Scrufari's compensation was never "reviewed per se" at any Trustees' meeting (Tr. at 201). When he was hired as Plan Manager, Scrufari was a carpenter and was keeping his Union benefits up, and the company-side Trustees had lost in arbitration as to the propriety of hiring a Union-side Trustee, so Hartz "just assumed" that Scrufari would be getting the General Business Agent rate and commensurate raises in accordance with the collective bargaining agreement (Tr. at 192–95). However, this assumption did not encompass the four hours of overtime per week. When the Trustees found out Scrufari was paying himself overtime, Hartz wrote Scrufari a letter telling him to stop. The Trustees subsequently adopted a resolution setting Scrufari's compensation at the General Business Agent rate, without the four hours overtime per week (Tr. at 195–98).

Hartz testified that there was no doubt in his mind when the company-side Trustees lost the arbitration that they would be paying Scrufari the same rate Sanoian was making (Tr. at 200). Although there was no periodic review of Scrufari's compensation by the Trustees, "it was just taken for granted that, as the year would end, the new wage scale would come into effect, so it was kind of built in for three years [under] the collective bargaining agreement ..." (Tr. at 201). Hartz acknowledged that he signed IRS Form 5500's, with attached Schedule C's for each Fund setting forth Scrufari's gross salary (Tr. at 201–03), and that when the Trustees voted in October 1992 to authorize the Plan Manager's salary it was set at exactly the same rate Sanoian was earning as General Agent (Tr. at 204). When the Trustees discovered Scrufari was taking weekly overtime they considered seeking reimbursement, but decided against it "because at best it was a foggy issue" (Tr. at 205). Finally, Hartz testified that the "Rabbi

Trust" proposal was considered as a means of equalizing Scrufari's and Sanoian's compensation, and was rejected not because Scrufari was undeserving of an additional pension but because the Funds could not afford it (Tr. at 206–09).

Angelo Massaro testified that he has been an employer-side Trustee of both the Pension and Welfare Funds since 1985. He also serves as Executive Secretary and General Counsel for the Building Industry Employers Association of Niagara County (Tr. at 287). Prior to becoming a Trustee, he represented the employer-side Trustees as an attorney in the arbitration over hiring Scrufari as Plan Manager (Tr. at 290, 307–08). He testified that from the time he became Trustee, there was no question in his mind that Scrufari was to be compensated in both salary and fringes at the same rate as Sanoian (Tr. 290). He explained the "Rabbi Trust" proposal as a device suggested by the Union-side Trustees to afford Scrufari the opportunity "to equalize the double pension status" Sanoian was entitled to as Business Agent (Tr. 290–92).

Massaro testified that he became aware after a series of meetings in 1992 that Scrufari was paying himself four hours of overtime per week, in addition to the 10 percent above General Foreman rate Sanoian was receiving. At the October 16, 1992 meeting, Massaro asked the Trustees if anyone suspected Scrufari of malfeasance, and no one did. He made a motion for an audit, but the motion did not pass. The Trustees then voted to set the Plan Manager's salary at a fixed annual amount of $59,196.80, with a benefit contribution of $11.25 per hour. This amounted to compensation at 10 percent over the General Foreman rate. According to Massaro, this was reasonable in comparison with other Funds for which he served as Trustee, and considering the work Scrufari did managing Funds of this size (Tr. at 292–96).

Massaro testified that he initiated the discussion at the meeting of November 5, 1992 about whether to terminate Scrufari and about whether to bring a lawsuit to recover repayment of the four hours overtime. Massaro was of the opinion that there was some basis for the overtime, since he thought Scrufari was to be paid at the same rate as Sanoian. He believed other Trustees thought so as well. According to Massaro:

> [W]hen I looked at it then, and I know this, and I look at it now, when the facts were presented I was disturbed that we didn't know about the four hours, however, there was no question in my mind that he was to be paid what Mr. Sanoian was to be paid, and there was a provision in the bylaws for, based on the general business agent for a forty-four hour week. In my opinion, and my analysis, it was reasonable for Mr. Scrufari to have thought he was entitled to that four hours, and I made a judgment call in that I decided for myself it would be difficult to recover that, and that is why I turned to Mr. Herrmann, either at that meeting or at a subsequent meeting and said, in effect, would you back us up, and let us know what your opinion is, because it could have been different to what mine was.

(Tr. at 315–16.) Herrmann said the issue was "foggy at best" (Tr. at 297).

After setting the Plan Manager's salary, the Trustees continued to monitor the amount to determine whether it was reasonable compared to other Funds (Tr. at 298–99). In a letter dated July 18, 1994, Leonard O'Sullivan provided a comparison of salaries paid by other Plans of relatively similar size. O'Sullivan concluded as follows:

> I think it's obvious that, even with the 3½% raise to the plan manager being requested, the salaries for the Local 280

plans cannot be considered excessive when matched against that portion of my personal practice that is similar to your plans in general size and other pertinent characteristics.

(Ex. 91).

Massaro testified that his understanding as to the equivalence of Scrufari's and Sanoian's salaries was based primarily on the fact that none of the Trustees raised an objection until 1992. This was corroborated by O'Sullivan's "weighted fringes" chart in 1989, and by the discussion pertaining to the "Rabbi trust" (Tr. at 300–01). He testified that when he stated in an interview with the Department of Labor on July 14, 1994 that Scrufari "should have come before the Board of Trustees before he raised his salary . . .," he meant that he "really would have preferred having him come before the Board on the four hours" (Tr. at 320).

Russell Scrufari testified that he is currently the Plan Manager for the Funds, having succeeded his father to the position in 1996. He has been employed in the Plan office since November 1984, initially as a computer operator and later as bookkeeper (Tr. at 331–34). He received wage increases at regular intervals, but in early 1989 he expressed to his father the concern that his salary-$9.95 per hour at the time was not commensurate with his experience. He was directed by his father to submit a letter to the Trustees, but to clear it with Sanoian first. Russell prepared a letter requesting a salary increase to $11.50 per hour (Ex. 38), and showed it to Sanoian. Sanoian said he had no problem with the request, and directed Russell to submit the letter to the Trustees at their next meeting. Russell submitted the letter, and the Trustees approved the increase (Tr. at 335–36; Ex. 55, p. 2). He went through the same process in February 1990, and the Trustees approved an increase to $12.50 per hour (Tr. 336–39; see also Ex. 39; Ex. 40, pp. 5–6).

Russell testified that he received further salary increases in July 1990, January 1991, July 1991, and January 1992. These increases were approved by the Plan Manager, but not by the Trustees (Tr. at 340–41). According to Russell, he did not go back to the Trustees after his salary was raised to $12.50 per hour because Sanoian had told him that if he received any further raises he would be making more than a residential Union carpenter. Instead, his father granted him "cost of living increases" in line with the rates paid under the collective bargaining agreement as well as "traditional" salary increases in the Fund office (Tr. at 350–53)

There is no resolution of the Board of Trustees delegating authority to determine Fund office pay raises to either the Plan Manager or to Sanoian (Tr. at 396–7). However, Santo Scrufari testified that he had given Russell pay raises, "after consulting [with] Sarkee Sanoian, since day one" (Tr. at 110), and that since 1985, Plan office salaries were set "at [his] discretion" (Tr. at 368, 395). According to Santo, Russell had become a "high commodity" and Santo was concerned that, if he did not give him the raises, he would lose him (Tr. at 371).

## CONCLUSIONS OF LAW

As mentioned, the only issue of law to be determined by the court at this juncture is whether Santo Scrufari breached his fiduciary duties under ERISA by unilaterally increasing his compensation as Plan Manager, and Russell Scrufari's compensation as a Plan office employee, without Trustee approval. The legal standards governing this issue were outlined in this court's published decision and order dated March 25, 2000, addressing defendant's summary judgment motion. See LaScala, et al. v.

*Scrufari, et al.,* 96 F.Supp.2d 233 (W.D.N.Y.2000). Briefly restated, plaintiffs claim that Scrufari's conduct violated ERISA §§ 404(a) and 406(b)(1). Section 404(a) provides:

> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>> (A) for the exclusive purpose of:
>>> (i) providing benefits to participants and their beneficiaries; and
>>> (ii) defraying reasonable expenses of administering the plan . . . .

29 U.S.C. § 1104(a)(1)(A). Section 406(b)(1) provides: "A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). Defendant seeks the "safe harbor" protection afforded by ERISA § 408, which allows Plan fiduciaries and parties who have an interest in the Plan[3] to receive "reasonable compensation" from the Plan for providing administrative services.

Specifically, section 408(b)(2) provides:

> The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:
>
> . . . . .
>
>> (2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid therefor.*

29 U.S.C. § 1108(b)(2)(emphasis added). Section 408(c)(2) contains a related provision:

> Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—
>
> . . . . .
>
>> (2) receiving any *reasonable compensation* for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan . . . .

29 U.S.C. § 1108(c)(2)(emphasis added).

In its March 2000 decision, upon analysis of the pertinent statutes, regulations, and case law, this court held that if plaintiffs can establish at trial that Scrufari's conduct violated *either* the fiduciary obligations contained in section 404(a) *or* the prohibitions against self-dealing contained in section 406(b)(1), then *neither* the exemption of section 408(b)(2) *nor* the exemption of section 408(c)(2) will apply. In other words, if the preponderance of the evidence presented at trial establishes that, by unilaterally increasing his and his son's compensation without Trustee approval, Scrufari either failed to discharge his duties solely in the interest of Plan participants and beneficiaries (in violation of section 404(a)(1)), or dealt with the assets of the Plan in his own interest or for his own account (in violation of section 406(b)(1)), then it does not matter whether the compensation was reasonable. *LaScala,* 96 F.Supp.2d at 238–40 (citing *Daniels*

**3.** Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii). ERISA defines a "party in interest" as follows:

> The term "party in interest" means, as to an employee benefit plan—
> (A) any fiduciary (including but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
> (B) a person providing services to such plan . . . .

29 U.S.C. § 1002(14). It is not disputed that Santo Scrufari is both fiduciary and party in interest with respect to the Local 280 Welfare and Pension Funds.

v. National Employee Benefit Services, Inc., 858 F.Supp. 684 (N.D.Ohio 1994); Whitfield v. Tomasso, 682 F.Supp. 1287 (S.D.N.Y.1988); Donovan v. Daugherty, 550 F.Supp. 390 (S.D.Ala.1982); Gilliam v. Edwards, 492 F.Supp. 1255 (D.N.J.1980)).

## I. Santo Scrufari's Compensation

### A. Duty of Loyalty under ERISA § 404(a)(1)(A)

■ Section 404(a)(1), which imposes an overall requirement upon fiduciaries of an Employee Benefit Plan to discharge all of their duties "solely in the interest of the participants and beneficiaries," establishes the foundation obligation of loyalty for all ERISA fiduciaries. Gilliam, 492 F.Supp. at 1261. This duty of loyalty is broad, based on both the specific statutory charge and the common law of trusts. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110–11, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C.Cir.1990). "In short, the fiduciary provisions of ERISA were designed to prevent a [fiduciary] 'from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" National Labor Relations Board v. Amax Coal Co., 453 U.S. 322, 334, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981) (quoting H.R.CONF.REP.NO. 93–1280, at 309 (1974), reprinted in 1974 U.S.C.C.A.N. 5089).

■ Where ERISA fiduciary duties arise, "they must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan ...," John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan, 26 F.3d 360, 367 (2d Cir.1994), and must be discharged by the fiduciaries "for the exclusive purpose" of providing benefits to Plan participants and their beneficiaries and of defraying reasonable administrative expenses. 29 U.S.C. § 1104(a)(1)(A); see Srein v. Soft Drink Workers Union, Local 812, 93 F.3d 1088, 1097 (2d Cir.1996). In doing so, the fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); see International Brotherhood of Painters and Allied Trades Union and Industry Pension Fund v. Duval, 925 F.Supp. 815, 821 (D.D.C.1996).

■ Considering the evidence presented at trial in light of these standards, there can be no question that the fundamental duty of loyalty imposed by ERISA § 404(a)(1)(A) governed Scrufari's conduct as a fiduciary of the Local 280 Funds. As such, it was incumbent upon him to ensure that the amount of his salary was no more than necessary to "defray[ ] reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii). Since Scrufari's salary was paid from the assets of the Funds, he therefore had the obligation to inform his fellow Trustees of his rate of pay while managing the Funds as an employee of Maloney & O'Sullivan, and a further obligation to inform the Trustees of each of his subsequent unilateral salary increases upon becoming permanent Plan Manager in March 1985.

■ However, the preponderance of the evidence also shows that the Trustees knew, or in the exercise of their fiduciary duties should have known, that from July 1985 (when he raised his salary from the General Foreman's rate to the General Agent's rate) Scrufari was being compensated at the same rate as Sanoian. First of all, when the Trustees voted at the March 7, 1985 meeting to appoint Scrufari as Plan Manager, they authorized his sala-

ry at "[h]is present rate of pay as a salaried employee . . ." (Ex. 13, p. 3). Scrufari testified that he was then receiving Superintendent's pay, commonly understood to be negotiable but roughly equivalent to the General Business Agent's pay. Although it was eventually determined at trial that Scrufari was being paid by Maloney & O'Sullivan at the General Foreman rate, the proof was equivocal as to the Trustees' understanding of what Scrufari's "present rate" was. Sanoian testified that he assumed Maloney & O'Sullivan were paying Scrufari at the Journeyman rate, while employer-side Trustees Hartz and Massaro both stated they were aware that Scrufari was receiving the same level of compensation as Sanoian.

The exact hourly rates paid to Sanoian and Scrufari were set forth on the charts prepared by O'Sullivan in February 1989, which were reviewed by the Trustees at the February 27, 1989 meeting (Exs. 15 & 84). Scrufari's gross annual salary was also set forth in the IRS Form 5500's submitted to the Department of Labor under signature by an employer-side Trustee and the Plan Administrator (Exs.86–89). Furthermore, in 1991 and 1992, the Trustees specifically dealt with the "Rabbi Trust" proposal to close the perceived gap between the compensation of Sanoian and Scrufari-*i.e.*, Sanoian's eligibility to participate in both the Local and International Pension Funds. The Trustees considered the issue on several occasions, and while there was a general consensus that Scrufari was doing a good job and was entitled to the supplemental pension benefit, the employer-side Trustees ultimately would not agree to it because it would be too costly (Ex. 90).

In addition, in late 1992 when the issue of Scrufari's weekly overtime came to light and the Trustees decided to set a specific annual salary for the Plan Manager's position, the salary was set at $59,196.80 per year. This was equal to 2,080 hours (40 hours per week for 52 weeks per year) at the rate of $28.46, the amount Scrufari was then receiving at the rate of General Foreman plus 10 percent-the same rate as Sanoian.

Based on this evidence, I cannot find that Scrufari's conduct in taking regular salary increases without express Trustee approval amounts to a breach of the duty of loyalty under ERISA section 404(a)(1). The same does not hold true, however, with respect to Scrufari's unauthorized overtime and accompanying "compensation weighted fringes." In this regard, the preponderance of the evidence shows that none of the Trustees knew, or had reason to know, until late 1992 that Scrufari's Plan Manager salary included four hours of overtime per week. This information came to light only upon an investigation of dues and salary records by the Office Committee, primarily at the behest of Union-side Trustee, Douglas Janese. Janese testified that he recommended the investigation at the time Scrufari was seeking use of an automobile in lieu of a raise, in order to determine whether Scrufari's compensation was reasonable in comparison to what other Plan Managers were paid. The investigation revealed that Scrufari was receiving four hours of overtime per week, in addition to a salary at the rate of General Foreman plus 10 percent. The Office Committee immediately ordered Scrufari to stop taking the overtime, advising that "[t]he job of Funds Manager is supposed to be one of forty hours per week with overtime *when and if necessary*" (Ex. 46). As discussed above, when the Trustees finally authorized a fixed salary for the Plan Manager's position, it was set at the General Business Agent's rate based on forty hours per week without overtime.

The preponderance of the evidence also shows that, after the Trustees approved the payment of weighted fringe benefits to employees in the Fund office effective January 1, 1989, Scrufari accepted payment of these benefits retroactive to March 20, 1984, when he began employment with the actuary. There was no evidence to suggest that other Fund office employees were granted similar benefits retroactively. While the correspondence regarding this matter shows that both the actuary and the Fund attorney had knowledge of the retroactive payment to Scrufari (*see, e.g.,* Exs. 32–34), and that this information may have been submitted to the IRS in conjunction with a restatement of the Plan to conform to changes in the tax law, the record is otherwise devoid of evidence to suggest that this increase in Scrufari's compensation was approved, or even contemplated, by the Trustees themselves.

 Defendants argue that, because plaintiffs LaScala and Marino were present at critical meetings at which Scrufari's compensation was discussed, but were not called as witnesses at trial, the court is required to draw the inference that their testimony would have been unfavorable to plaintiffs' case. It is true as a general matter that the non-appearance of a litigant at the trial, or his failure to testify as to facts material to the case and as to which he has "especially full knowledge," creates an inference that the litigant refrained from appearing or testifying because the truth, if made to appear, would not aid his cause. *Gray v. Great American Recreation Association, Inc.,* 970 F.2d 1081, 1082 (2d Cir.1992) (citations omitted). However, in this case there has been no showing that plaintiffs LaScala and Marino, as two of the several Union-side Trustees who were present at the various meetings at which some aspect of Scrufari's compensation was discussed, have any special knowledge of material facts that would require the court to draw an adverse infer-

ence from their absence. The minutes from the meetings they attended were put in evidence, and defendants were free to call either LaScala or Marino, or both, as witnesses in the defense case. *See Brice v. Nkaru,* 220 F.3d 233, 240 (4th Cir.2000) (no adverse inference permitted based on party's failure to testify when equally available to either party).

In any event, as the above discussion demonstrates, the inference sought by defendants-*i.e.,* that the Trustees knew Scrufari was being compensated at the same rate as Sanoian-has for the most part already been drawn by the court based upon the preponderance ·of the evidence that *was* presented at the trial. Based on this proof, the court finds that Scrufari's unilateral payment to himself of four hours of weekly overtime from the pay period ending March 26, 1989 to the pay period ending October 4, 1992, (including an initial retroactive payment of $769.44), as well as his acceptance of additional weighted fringe benefits based on this inflated salary and his unauthorized award to himself of retroactive weighted fringes from March 20, 1984 through January 1, 1989, constitutes a breach of his fiduciary duty under ERISA section 404(a)(1) to act solely in the interest of Plan participants and beneficiaries.

**B. Duty to Avoid Self–Dealing Under ERISA Section 406(b)(1)**

 As set forth above, section 406(b)(1) prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest[s] or for [their] own account[s]." 29 U.S.C. § 1106(b)(1). This prohibition imposes on fiduciaries "a duty of undivided loyalty to the plans for which they act ...," so as to deter them from using their authority to engage in transactions "which may affect the exercise of their best judgment as fiduciaries." *Gilliam v. Edwards,* 492 F.Supp. at 1262–63

(quoting 29 C.F.R. § 2550.408b–2(e)(1)). Section 406(b)(1) "creates a *per se* ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans." *Id.* at 1263 (citation and footnote omitted). In essence, section 406(b)(1) "suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered ... may not if self-dealing is involved in the transaction securing the payment." *Id.*

■ The findings above with respect to Scrufari's conduct in breach of the duty of loyalty under section 404(a)(1) pertain as well to his conduct under section 406(b)(1). Specifically, although the Trustees' knowledge (or presumed knowledge) that Scrufari was being compensated at the same rate as Sanoian negates any violation of fiduciary duties with respect to rate of pay or regular salary increases, the preponderance of the evidence at trial establishes that Scrufari clearly dealt with Plan assets in his own interest in violation of section 406(b)(1) by causing the Plan to pay him four hours of weekly overtime for almost four years, and by causing the Plan to pay him weighted fringe benefits retroactively without Trustee authorization. *See Marshall v. Kelly,* 465 F.Supp. 341, 353 (W.D.Okla.1978) (defendant dealt with Plan assets in his own interest in violation of § 1106(b)(1) by causing Plan to pay him $9,000), *cited in Gilliam,* 492 F.Supp. at 1263.

## II. Russell Scrufari's Compensation

■ Plaintiffs also contend in this case that by awarding salary increases to his son, Russell, without notifying or seeking the approval of the Trustees, Santo Scrufari further breached the fiduciary duty of loyalty he owed the participants and bene-ficiaries of the Funds duty under ERISA § 404(a)(1), and further engaged in fiduciary self-dealing prohibited by ERISA § 406(b). Notably, plaintiffs' trial briefs contain no case law support or other authority for this contention. On the other hand, defendant cites *New York State Teamsters Council Health and Hospital Fund v. Estate of DePerno,* 18 F.3d 179 (2d Cir.1994), to support the proposition that there can be no finding of fiduciary liability based on Russell's compensation because plaintiffs have failed to show that the Funds suffered any loss as a result of Russell's employment.

In the *DePerno* case, Rocco F. DePerno was a Trustee of the Fund, while his son, Rocco A. DePerno, was the attorney for the Fund. The son owned a seasonal restaurant, and for a period of years the father employed two cooks from the restaurant as maintenance workers in the Fund's headquarters during the months when the restaurant was closed for business. The district court found after a bench trial that the father's conduct as Trustee breached several ERISA fiduciary duty provisions, and that the son knowingly participated in the breach. However, the court also found that since the work of the seasonal maintenance workers was beneficial to the Fund, and since their compensation was reasonable, the plaintiff Fund had failed to meet its burden of showing that the breach caused any tangible loss. The court accordingly awarded the Fund one dollar in nominal damages. 816 F.Supp. 138, 151 (N.D.N.Y.1993).

The Second Circuit affirmed the finding that a breach of fiduciary duty had occurred, but remanded the case for a determination of whether the Fund had suffered a loss. According to the Court of Appeals, under principles of trust and fiduciary law applied in the ERISA context, once the plaintiff had established that the defendants breached a fiduciary duty to the

Fund by hiring the cooks, the burden should have shifted to the defendants to show that the hiring was "fair and reasonable under all of the circumstances." *De-Perno*, 18 F.3d at 183. As stated by the Circuit Court:

> If the defendants cannot persuade the trier that the services rendered by the two additional maintenance workers were reasonably necessary, the fund is entitled to its entire payment. If the workers were reasonably necessary, then the defendants must prove that the value of their reasonably necessary services at least equaled the sums paid; otherwise, the plaintiffs are entitled to recover damages for the difference.

*Id.*

In this case, even if plaintiffs have sustained the burden of showing that Russell's salary increases resulted in a breach of fiduciary duties on the part of defendant, the preponderance of the evidence shows that the Funds did not suffer any loss as a result of Russell's employment. As discussed above in the court's findings of fact, the evidence presented at trial established that Russell began working for the Funds in 1984 as a computer operator earning $5.00 an hour, after receiving an associate's degree in computer science from Niagara County Community College. He later earned the Certified Employee Benefit Specialist degree through the International Foundation of Employee Benefit Plans, upon completing course work and passing exams. His compensation was increased at regular intervals, either in recognition of his new job skills and expanded responsibilities or as part of an annual cost

of living adjustment or "traditional" raises given to all staff. All but two of the increases were authorized by the Plan Manager. On those two occasions, Russell made specific requests to the Plan Manager for pay raises commensurate with his experience, and was told to take the matter up with Sanoian. On each of these occasions, Russell was directed to write a letter to the Trustees, and on each occasion the Trustees approved the requested increase. He received four subsequent increases and, as of the commencement of this action in December 1993, his wage rate was $15.20 per hour. There is nothing in the record to controvert the Plan Manager's understanding that this rate was justified by the market for qualified computer operators in the early 1990s. Indeed, plaintiffs presented no evidence in rebuttal challenging the reasonableness of Russell's compensation, and there is nothing contained in the minutes of the Trustee meetings, or in the trial testimony, to suggest that any of the Trustees ever objected to Russell's employment or salary prior to the filing of this action.

Based on the foregoing, I find that plaintiff has failed to establish any breach of the Plan Manager's fiduciary duties under ERISA §§ 404(a) or 406(b) as the result of his authorization of salary increases for his son, Russell.

### III. Statute of Limitations

In defendant's "Trial Memorandum" dated November 21, 2002 (Item 177), defense counsel set forth the argument that, under the applicable statute of limitations of ERISA § 413,[4] any amounts found by

---

4. ERISA § 413 provides:
 No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of-

 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

the court to constitute damages as overpayments to Scrufari would be recoverable by the Funds only between December 1990 (three years prior to commencement of this action) and October 1992–*i.e.*, when the Trustees took action with respect to Scrufari's compensation and hence can be charged with "actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). In response to this argument, plaintiffs moved for leave to file a fourth amended complaint in order to plead "fraud or concealment" so as to bring the breach of fiduciary duty claims within the statute's six-year "discovery" limitations period.

When trial commenced on December 2, 2002, the court heard argument on plaintiffs' motion to amend, and denied the motion from the bench as untimely under the procedural rules and the case law. The court found "no compelling reason" to allow plaintiffs to allege fraud or concealment on the eve of trial, and held "that as far as the time period, we are limited to three years ... [n]ot six" (Tr. at 13).

In his post-trial brief, plaintiffs' counsel urges the court to reconsider or modify its ruling to the extent it holds that recovery on behalf of the Funds is limited to salary payments taken by Scrufari during the three-year period prior to commencement of the action. Plaintiffs rely on the district court's opinion in the *DePerno* case. There, the off-season cooks were employed by the Fund year after year, beginning in September 1981 and ending in April 1986, but the Trustees of the Fund did not obtain knowledge of the cooks' hiring until August or September 1986, and did not commence their action until October 1988. The court nonetheless found that the action was timely since it was commenced

"within six years of 'the last action [April 1986] which constituted a part of the breach or violation,' and/or within three years of 'actual knowledge [August or September 1986],' of the Trustees ...." *DePerno*, 816 F.Supp. at 144 (quoting 29 U.S.C. § 1113).

■ Here, the proof at trial has established that Scrufari paid himself four hours of overtime per week without Trustee authorization, and failed to inform the Trustees that he was doing so, for the entire period from March 1989 through October 1992 (plus an initial retroactive payment). The proof has also established that Scrufari accepted increased weighted fringes benefits based on this inflated salary, as well as unauthorized retroactive weighted fringes from March 20, 1984 through January 1, 1989. Like the off-season employment of the cooks by the self-dealing Trustee in *DePerno*, Scrufari's conduct in breach of his fiduciary duties was in furtherance of a single scheme, constituting a single breach for the purposes of ERISA § 413(1)(A) and (2)-*not* a separate breach each time Scrufari issued himself a paycheck. Accordingly, regardless of whether the "fraud or concealment" exception applies, this action is timely under both the three-year rule of ERISA § 413(2) and the general six-year limitation of ERISA § 413(1)(A), and no part of plaintiffs' claim is time-barred.

To the extent the court's December 2, 2002 bench order can be construed to limit recovery on behalf of the Funds to overtime payments and weighted fringes benefits taken by Scrufari during the three-year period prior to commencement of the action, that order is modified to reflect the court's findings herein.

---

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such action may be commenced not

later than six years after the date of discovery of such breach or violation.
29 U.S.C.A. § 113.

## CONCLUSION

The foregoing constitutes the court's findings of fact and conclusions of law after trial. A telephone conference will be held with counsel on Monday, January 26, 2004, at 11 a.m. to discuss further proceedings in the case, including a schedule for submissions with respect to calculation of damages in accordance with the findings herein.

So ordered.

## OPINION GRANTING RECONSIDERATION

On January 15, 2004, after careful consideration of the evidence presented at trial, the parties' arguments on summation, and the matters set forth in post-trial submissions, this court issued its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. The court concluded that, while the evidence in the case did not support a finding that defendant Santo Scrufari's conduct in taking regular salary increases as Plan Manager of the Niagara–Genesee & Vicinity Carpenters Local 280 Welfare and Pension Funds without express approval of the Funds' Trustees amounted to a breach of fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), the same did not hold true with respect to defendant's unauthorized overtime and accompanying "weighted fringes." More specifically, the court found that defendant's payment to himself

of four hours weekly overtime from the pay period ending March 26, 1989 to the pay period ending October 4, 1992, as well as his acceptance of additional weighted fringe benefits based on this inflated salary and his award to himself of retroactive weighted fringes from March 20, 1984 through January 1, 1989—all without the approval of the Trustees—constituted a breach of his fiduciary duties under ERISA sections 404(a)(1) and 406(b)(1) (Item 201, at 28–32).

Defendant now moves for reconsideration of the court's finding that defendant was improperly credited with "compensation weighted fringes" retroactively for the period from 1985 to 1989 (Item 208).[1] According to defendant, this issue was neither raised in the pleadings nor litigated before the court, and in any event the evidence establishes that the Trustees fully discussed and specifically authorized the granting of retroactive fringe benefit credit in order to comply with Section 413 of the Internal Revenue Code.[2]

The court heard oral argument of defendant's motion for reconsideration on May 28, 2004. For the following reasons, defendant's motion is granted.

In its "Findings of Fact," the court determined that the question of "weighted fringes" first arose at the Funds' meeting of February 27, 1989 when Leonard O'Sullivan, one of the actuaries, suggested that the Trustees look into compliance with Section 89 of the Internal Revenue Code, which was enacted as part of the Tax Reform Act of 1986.[3] The minutes of the

---

**1.** Defendant does not challenge in this motion the court's finding that the "overtime weighted fringes" attributable to the unauthorized four hours per week overtime was not approved by the Trustees.

**2.** Section 413 of the Internal Revenue Code and implementing Treasury Department regulations essentially provide that the employees of the union sponsoring a benefit plan, as well

as the employees of the plan itself, are subject to the Code's protections against pension or welfare benefit calculations that discriminate in favor of highly compensated employees. *See* 26 U.S.C. § 413(b)(8); 26 C.F.R. § 1.413–1(i).

**3.** Section 89 was repealed before it ever took effect. Like Section 413, the thrust of Section 89 was to prevent employers (including un-

Trustee meeting on June 12, 1989, indicated that the Trustees approved O'Sullivan's recommendation authorizing these benefits on behalf of Fund employees, retroactive to January 1, 1989. The court found that correspondence between defendant, Mr. O'Sullivan, and Funds' counsel David Herrmann in April and May of 1990 indicated that, "without any additional approval from the Trustees, [defendant] Scrufari subsequently awarded himself payment of these benefits retroactive to March 20, 1984, when he began employment with the actuary" (Item 201 at 12).

Based on these factual determinations, the court made the following findings in its "Conclusions of Law:"

> The preponderance of the evidence ... shows that, after the Trustees approved the payment of weighted fringe benefits to employees in the Fund office effective January 1, 1989, Scrufari accepted payment of these benefits retroactive to March 20, 1984, when he began employment with the actuary. There was no evidence to suggest that other Fund office employees were granted similar benefits retroactively. While the correspondence regarding this matter shows that both the actuary and the Fund attorney had knowledge of the retroactive payment to Scrufari (*see, e.g.*, Exs. 32–34), and that this information may have been submitted to the IRS in conjunction with a restatement of the Plan to conform to changes in the tax law, the record is otherwise devoid of evidence to suggest that this increase in Scrufari's compensation was approved, or even contemplated, by the Trustees themselves.

(*Id.* at 29).

In support of his motion for reconsideration, defendant cites the January 29, 1999 affidavit of Mr. Herrmann submitted in this case in opposition to plaintiffs' prior motion for summary judgment, in which Mr. Herrmann explained that the "weighted fringes" concept was his idea (Item, 121,¶ 6). According to Mr. Herrmann, Local 280 and the Funds had been making the same level of hourly contributions to the welfare and pension funds on behalf of their office employees as the participating employers were making on behalf of union carpenters, who earned much higher hourly salaries but worked fewer hours per year. The result was that, due to limits on the amounts of pension and welfare benefits payable, the union and the Funds were contributing significant amounts for office employee pension and welfare benefits that would accrue but would never be received. To address this problem, Mr. Herrmann suggested the "weighted fringe" program as a means of making fringe benefit awards proportionate to the employee's compensation (*id.* at ¶¶ 6–10).

Mr. Herrmann also related in his January 29, 1999 affidavit that some time in early or mid–1988, he met with defendant to discuss this problem. At that meeting, Mr. Herrmann explained that the amounts deducted from the benefit contributions for lower paid Fund and union office workers could be applied to the pension and welfare fund contributions made on behalf of higher paid employees, including defendant. After obtaining the approval of Sarkee Sanoian (Local 280's General Business Agent), they contacted Mr. O'Sullivan, who eventually produced cost estimates and charts for presentation of the program to the Trustees (*see id; see also* Ex. 78). According to Herrmann, "O'Sullivan reported back that there would be 'no cost,' as the increase in contributions for the highly paid (Scrufari, Sanoian and ... Gordon Knapp) was completely offset by

---

ions and plans) from discriminating against lower-salaried employees by providing greater

welfare benefits to higher-salaried employees (*see* attachment to Item 210).

the decrease for the lower paid" (*id.* at ¶ 10).

In the meantime, at the Funds' meeting of November 3, 1988, Mr. Herrmann explained to the Trustees his "weighted fringes" recommendation as a way to bring the pension plan into compliance with the non-discrimination requirements of Section 413 of the Internal Revenue Code (*see* Item 213, Attachment 2).[4] The minutes of the meeting reflect that after Mr. Herrmann's presentation, a motion was passed to follow Mr. Herrmann's suggestions "as defined by his September 19, 1988 letter to the Trustees" (*id.* at p. 6).

Mr. O'Sullivan's chart presentation took place at the meeting of February 27, 1989. The minutes of the meeting indicate that O'Sullivan presented two scenarios for the Trustees' consideration as a means of bringing the welfare plan into compliance with Section 89 (*see* Ex. 15). The matter was deferred to give the union office the opportunity to discuss which scenario it wished to incorporate, and to give the Funds' office the opportunity to "evaluate its present employee compensation to determine if we are in compliance" with Section 89 (*id.* at p. 2).[5] The minutes further indicate that with respect to the pension plan, Mr. Herrmann "reviewed with the Trustees the charts submitted by . . . O'Sullivan showing the pension and welfare contributions by the Union Office and the Funds Office to conform with our prior

approval of Internal Revenue Code Section 413" (*id.* at p. 3).

The transcript of the February 27, 1989 meeting reflects that the issue of granting weighted fringe benefit credits to Fund and union office employees in order to comply with the tax laws was discussed at considerable length by O'Sullivan, Herrmann, and the Trustees (*see generally* Ex. 57). Toward the conclusion of the discussion, defendant asked Mr. O'Sullivan whether weighted fringe benefit credit would be given to the Funds' office staff "going back to when they started . . . ," and O'Sullivan replied, "I don't think you have any choice there." (Ex. 57, p. 15).

At trial, Mr. Herrmann was asked by plaintiff's counsel to describe documents attached to defendant's May 29, 1990 letter, referred to above, by which defendant transmitted to Herrmann information pertaining to the compensation and pension credits of Fund office and union office employees for tax purposes. The testimony is reported as follows:

Q Can you tell us what this document is, Mr. Herrmann?

A I had to submit a determination letter request for the pension plan to the Internal Revenue Service, and to complete that I had to fill out forms 5302, showing the compensation and the pension benefits of the employees in the Fund Office, which was treated as a separate pension plan, and the employees in the Union

---

**4.** Item 213 is the May 18, 2004 affidavit of Russell Scrufari, submitted in support of defendant's motion for reconsideration. There are three attachments to the affidavit: Attachment 1 is a copy of the Local 280 Pension Plan Summary Plan Description ("SPD") dated September 1, 1989. Attachment 2 is a printout of the minutes of the November 3, 1988 Trustees meeting. Attachment 3 is a copy of a letter from Mr. Herrmann to defendant dated September 19, 1988, explaining the proposal for bringing the pension plan

into compliance with Section 413 of the Internal Revenue Code. Apparently, these documents were not previously made part of the record before the court, nor were they entered into evidence at trial.

**5.** As reflected in the minutes of the Welfare Fund Trustees' June 12, 1989 meeting, O'Sullivan's "scenario 2" proposal was ultimately adopted "as a means of attaining compliance with [Section 89]" (Ex. 56, p. 2).

Office, that was treated as a separate pension plan, and Mr. Scrufari sent me these documents so that I could do that calculation.

. . . . .

Q Mr. Herrmann, with respect to the third page of that document, are there calculations that were required that were made on that document in order for you to submit that to the Internal Revenue Service?

A Yes.

Q Would you tell us the nature of these calculations as far as why they were required by the I.R.S. in connection with the weighted fringes?

A Well, I needed this information to calculate the benefit that each person received, and what this is it's a list of the hours credited to each person in each year, and the one we are looking at is the third page is Santo Scrufari, and it shows the hours that he credited himself for years going from 1965 to 1990, and off to the left he has written down the hours that were credited to him before he gave himself the compensated weighted fringes retroactively.

Q And were these calculations made for other individuals with respect to these weighted fringes?

A Yes, they were also made for Sarkee Sanoian and Gordon Knapp.

Q And were they made retroactively from 1989?

A Yes.

Q To the point where they [sic] contributing members of the pension fund?

A Well, Sarkee's go back, I think, the furthest, because his union employment started the earliest, and his goes back to 1981, Santo's calculation goes back to 1984, and Knapp's calculation goes back to ... 1985 ....

Q And just with respect to this document, would you describe to the Court

how this weighted fringe works, and if there is a pivot point for measuring it?

A Yes, they decided that the, the trustees decided that the pivot point would be the journeyman's rate, and people who earned a salary more than journeyman's rate would have their compensation leveraged up proportionately, and those who earned, or had their fringes levered up proportionately to compensation, and those who earned less than journeyman's rate would have their fringes leveraged downward in proportion to compensation, and these people who got it retroactively are the people who had leveraged up.

. . . . .

Q These individuals who were beneficiaries of the weighted fringes being applied retroactively, how, were they done proportionate to their income, and the carpenter's rate?

A Yes, I checked these numbers for that, and Mr. Scrufari's compensation was leveraged up in proportion to general agent's rate, back to, I think, mid '85, and before that it was leveraged up in proportion to general foreman's rate, which is ten percent lower, that is for 1984, and the first part of 1985.

Q And how about Mr. Sanoian?

A Mr. Sanoian for the entire, well, not the entire period, his was leveraged up based on general agent's rate, ten percent above general foreman's I think, back through ... sometime in 1983, and before that he was a general foreman as well.

(Tr. at 154–58).

In his May 14, 2004 affirmation submitted on behalf of plaintiffs in opposition to this motion for reconsideration, Mr. Herrmann states (among other things) that there was never any discussion among the Trustees, or between himself and defen-

dant, about granting Fund and union office employees weighted fringes retroactively to the beginning of their service (*see* Item 210, ¶ 14). However, this position is directly controverted by his testimony at trial and statements made in affidavits previously submitted to the court, as well as the transcript of the February 27, 1989 meeting, all of which suggest that the Trustees did, in fact, consider and approve compensation weighted fringe benefits retroactively for defendant and other highly paid Fund and union office employees. Accordingly, Mr. Herrmann's May 14, 2004 affirmation is entitled to little weight in determining the matters raised by the motion for reconsideration.

As this discussion demonstrates, although the issue was not fully litigated, the weight of the evidence in the record before the court and available to the parties at the time of trial supports the conclusion that the Trustees considered and approved the granting to defendant of compensation weighted fringe benefits retroactively to the beginning of his employment with the actuary. As a result, the court's previous finding that defendant breached his fiduciary duties by accepting retroactive credit for compensation weighted fringes without Trustee approval was erroneous.

Accordingly, defendant's motion to reconsider (Item 208) is granted. The court's January 15, 2004 findings of fact and conclusions of law are amended to reflect the matters set forth above. A telephone conference will be held with counsel on August 23, 2004 at 11 a.m. to discuss further proceedings in the case, including a schedule for submissions with respect to calculation of damages in accordance with the findings herein.

So ordered.